AroCHEM INTERNATIONAL, INC., AroChem Corporation and William R. Harris, Plaintiffs–Appellants,

v.

Harold W. BUIRKLE, Defendant–Appellee.

No. 413, Docket 91-7641.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1991.

Decided June 30, 1992.

Richard F. Lawler, Greenwich, Conn. (Kari A. Pedersen, Whitman & Ransom, of counsel), for plaintiffs-appellants AroChem Intern., Inc., and AroChem Corp.

Richard D. Weinberg, New York City (Adam B. Rowland, Shereff, Friedman, Hoffman & Goodman, of counsel), for plaintiff-appellant William R. Harris.

Charles E. Schaub, Jr., Boston, Mass. (Robert F. Sylvia, Susan B. Tuchman, William R. Moore, Hinkley, Allen, Snyder & Comen, Boston, Mass., James A. Moss, Glenn S. Kerner, Herrick, Feinstein, New York City, of counsel), for defendant-appellee.

Before MESKILL, WINTER and WALKER, Circuit Judges.

WINTER, Circuit Judge:

Appellants AroChem International, Inc., AroChem Corporation (collectively "Aro-Chem"), and William R. Harris brought the instant matter against Harold Buirkle for defamation and for tortious interference with a contractual and commercial relationship. A jury trial commenced, and, at the close of the plaintiffs' main case, Judge Stanton directed a verdict in favor of Buirkle. He held that California law governed and that Buirkle's allegedly defamatory statements were privileged. 767 F.Supp. 1243. Additionally, Judge Stanton held that Harris and AroChem had failed to prove their tortious interference claims. Harris and AroChem appeal. We affirm.

## BACKGROUND

Harris, a Connecticut resident, is founder, chair, president, and majority shareholder of AroChem, a petroleum and petrochemical business with executive offices in Stamford, Connecticut. In 1987, Edwin E. Wells assisted Harris in obtaining from Victory Holding Company, Crail Fund, and Victory Oil Company (collectively "Victory") financing needed to form AroChem. In return, Wells and Victory received a portion of AroChem's common stock and seats on its six-member board of directors. Pursuant to this agreement, Harris owned 60% of AroChem's common stock, Wells owned 10.625% of the stock, Victory owned 27.5%, and Wells' former employer, Allen & Company, owned 1.875%. Additionally, Wells and two individuals associated with Victory—S.L. Hutchison and Eric Johnson—were elected to AroChem's board of directors. Victory also holds $17.3 million in notes from AroChem.

Less than a year after AroChem's formation, disagreements about its operation arose among Harris, Victory, and Wells. These disputes intensified, and both Harris and Wells sought to purchase Victory's interests. Wells claimed that he entered into an agreement with Victory in March 1989 to purchase Victory's rights in AroChem. Victory disputed this claim and, on April 13, 1989, Victory filed suit against Wells in the District Court for the Central District of California. In that action, Victory sought a declaratory judgment that it was not contractually bound to sell its interests in AroChem to Wells. Wells answered the complaint, disputed its allegations, and asserted a number of counterclaims against Victory.

In July 1989, Harris sued Wells and Victory in the District Court for the District of Connecticut. Harris' complaint asserted a variety of state and federal claims, including securities fraud and RICO violations. In August 1989, Wells sued Harris and AroChem, again in the District of Connecticut. This action also involved allegations of securities fraud, RICO violations, and common-law fraud. In April 1990, this latter complaint was amended by Wells to assert similar claims against Victory. Victory responded with RICO and common-law counterclaims against Wells.

Harold Buirkle, a New Jersey resident and the defendant-appellee in the instant matter, became involved when he agreed to

assist Wells in his attempt to purchase Victory's interests in AroChem. This agreement was formalized in October 1989, when Wells and Buirkle signed a detailed "Joint Litigation Agreement." The Joint Litigation Agreement provided that Buirkle would help finance expenses for litigation and related matters incurred by Wells in his bid to acquire Victory's stock and other interests in AroChem. Buirkle also agreed to assist Wells in raising the capital needed to finance a buy-out of Victory and Harris. In return, if Wells was successful in his attempt to obtain a controlling interest in AroChem before December 31, 1990, Buirkle would be entitled to purchase certain AroChem common stock.

In November 1989, Harris and Victory signed a Stock Purchase and Settlement Agreement (the "Harris/Victory Agreement"), which provided for Harris' acquisition of Victory's interests in AroChem for $24.4 million and the resignation of the two Victory representatives on AroChem's board of directors. The agreement was executed in Connecticut and was scheduled to close on January 2, 1990, or on some other mutually-agreed upon date. Wells obtained a copy of the Harris/Victory Agreement in late-November 1989. He, in turn, informed Buirkle of the agreement. The Harris/Victory Agreement never closed. Indeed, Harris and AroChem brought the instant lawsuit because, they allege, Buirkle's and Wells' actions during November and December 1989 caused the deal to fall through.

The allegations concerning Buirkle's and Wells' actions are based on the following events. On November 25, 1989, Wells wrote to Victory and Harris, requesting additional information about the Harris/Victory Agreement. On December 7, 1989, Wells sent a second letter to Victory, objecting to the proposed sale of AroChem stock to Harris and threatening Victory with a lawsuit if it closed on the sale. Buirkle learned of this correspondence.

Harris and AroChem had made arrangements with Chase Manhattan Bank ("Chase") and Drexel Burnham Lambert ("Drexel") to obtain financing for certain AroChem operations. On January 2, 1990, and again on January 5, 1990, representatives of Wells sent letters on Wells' behalf to Chase and Drexel, urging them, for a number of reasons, not to provide financing to AroChem. Additionally, on December 11, 1989, representatives of Wells sent a letter to the Office of the Commissioner of Financial Institutions for the Commonwealth of Puerto Rico ("OCFI"), detailing a number of unlawful activities that AroChem was alleged to have engaged in with respect to its Puerto Rican operations, and suggesting that the OCFI investigate these activities.

On December 20 and 21, 1989, at Wells' request, Wells and Buirkle met with representatives of Victory in Los Angeles, California. The evidence indicated that the reason for the meeting was to attempt to settle the ongoing disputes between Victory and Wells, including the California litigation. Before discussions began, the participants signed a confidentiality agreement, which stated in pertinent part:

The undersigned have agreed to meet together to attempt to resolve business and legal disputes between and among themselves, including settlement of claims that have been or might be brought in litigation presently pending between and among them in California and Connecticut. It is the intention of the parties that the meeting shall be deemed a compromise negotiation....

At this meeting, Wells made a number of allegations of wrongdoing by Harris. He claimed that Harris was looting AroChem and accumulating this stolen money in offshore bank accounts. Additionally, Wells suggested that Harris was planning to flee the United States within the year. Buirkle allegedly corroborated these statements by nodding, gesturing, and saying "yeah." And, at the conclusion of the second day of discussions, Buirkle stated that "it's ironic that here we are getting together to talk about buying Mr. Harris out when in fact we should be putting him in jail."

During the second day of the meeting, Wells made an offer to purchase Victory's interests in AroChem, rather than have

Victory sell those interests to Harris. Wells offered less money to Victory for its AroChem interests than Harris had offered. However, Wells did propose to release Victory from any liability stemming from Harris' alleged improprieties. Wells' attorney stated that if Victory sold its interests to Harris, Wells would sue Victory, and the ensuing lawsuit would be an unpleasant experience.

Representatives of Victory met with Harris in New York on January 11, 1990. Eric Johnson, a Victory representative, told Harris that Victory was not prepared to complete the sale of Victory's interest in AroChem because of what Wells and Buirkle had intimated about Harris during the December meeting. The closing was postponed until February, so that Victory could investigate the charges made against Harris. By the time the investigation was completed, and Victory was once again prepared to sell to Harris, one of Harris' sources of financing, Drexel, had filed for bankruptcy. Harris was unable to find alternative funding, and the deal never closed.

Harris and AroChem filed the instant matter against Buirkle in a New York State court on May 3, 1990. They alleged that Buirkle defamed Harris at the December meeting, and that he tortiously interfered with the contractual and commercial relationship between Harris and Victory. The latter claims are based in part on Buirkle's remarks at the December meeting. They are also based on Buirkle's aiding of Wells' effort to acquire Victory's interest in AroChem and on the letters described above.

Buirkle removed the suit to the Southern District of New York. A jury trial began on June 3, 1991. At the conclusion of Harris' and AroChem's main case, Buirkle moved for a directed verdict. Judge Stanton granted this motion on the ground that any statements made by Buirkle during the Los Angeles negotiations were privileged under California law and could not be the basis of a defamation claim. In addition, Judge Stanton held that Harris and AroChem had failed to introduce sufficient evidence to allow their tortious interference claims to go to the jury. Harris and AroChem appeal.

## DISCUSSION

Harris and AroChem contend that the district court should have applied Connecticut law, rather than California law, and that Buirkle's allegedly defamatory statements are not privileged under Connecticut law. Alternatively, they contend that the statements are not privileged under California law. Finally, they argue that Judge Stanton improperly directed a verdict against them on their tortious interference claims. We reject each of these arguments.

### 1. The Judicial–Proceeding Privilege

The parties disagree over which state's law—in their view, Connecticut's or California's—determines whether Buirkle's allegedly defamatory statements are privileged. This is an important issue because, unlike most states, California broadly privileges statements made during the course of judicial proceedings, including those made in settlement negotiations. See Cal. Civ.Code § 47(b)(2) (Deering 1991) ("A privileged publication or broadcast is one made ... [i]n any ... judicial proceeding."); see also Silberg v. Anderson, 50 Cal.3d 205, 212, 266 Cal.Rptr. 638, 786 P.2d 365 (1990) ("[The privilege] applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved."). In contrast, Connecticut privileges only statements made during a formal judicial or administrative proceeding or formally submitted to a court or administrative body. Connecticut's privilege thus does not protect statements made outside of official proceedings, even when they concern such proceedings. See, e.g., Petyan v. Ellis, 200 Conn. 243, 510 A.2d 1337, 1338–39 (1986).

A federal court, sitting in diversity, must look to the choice-of-law rules of the state in which it sits—here New York—

to resolve conflict-of-law questions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). In tort actions, New York applies a so-called interest analysis. *Babcock v. Jackson,* 12 N.Y.2d 473, 481–82, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 196–97, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985); *see also Machleder v. Diaz*, 801 F.2d 46, 51 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987). Under such an analysis, the law of the jurisdiction having the greatest interest in the litigation applies. *Schultz*, 65 N.Y.2d at 197, 491 N.Y.S.2d 90, 480 N.E.2d 679. In deciding which state has the prevailing interest, we look only to those facts or contacts that relate to the purpose of the particular laws in conflict. "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Id.* We conclude that California has the greatest interest in the instant matter.

■ As part of interest analysis, the New York Court of Appeals has distinguished between rules regulating conduct and rules governing loss allocation. Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies. *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679. Thus, in *Babcock*, the New York Court of Appeals noted that in an action involving an automobile accident, when the primary issue involved the manner in which the defendant had been driving at the time of the accident, the jurisdiction where the accident occurred "will usually have a predominant, if not exclusive, concern." 12 N.Y.2d at 483, 240 N.Y.S.2d 743, 191 N.E.2d 279. The locus jurisdiction has the predominant interest where rules regulating conduct are at issue, because of its interest in affecting the conduct of those who act within the jurisdiction and of a reliance interest on the part of the actors whose conduct is at issue. *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679.

On the other hand, when the law in conflict is loss allocating, the law of the state where at least one of the parties is domiciled generally applies. *See Neumeier v. Kuehner*, 31 N.Y.2d 121, 125–26, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972); *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679. The locus state has little interest in controlling the remedies available to non-domiciliaries injured by admittedly tortious conduct, *i.e.*, conduct recognized by conduct-regulating rules as tortious in each interested state. If the parties share a domicile, that state is obviously most interested in enforcing its loss-allocating rules. *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679. And even in the so-called "split-domicile" cases, the law of the domicile of one of the parties ought to apply. *See Neumeier*, 31 N.Y.2d at 125–26, 335 N.Y.S.2d 64, 286 N.E.2d 454 (applying Ontario guest statute to bar an Ontario plaintiff's action against a New York driver for injuries sustained in an Ontario automobile accident).

Having set out the rules generally governing our choice-of-law decision, we turn now to the facts of the instant matter. Although the parties' briefs focus on the choice between Connecticut and California law, we must recognize that there appear to be three potentially interested states— California (the place where the conduct at issue occurred), Connecticut (the plaintiffs' domicile), and New Jersey (Buirkle's domicile).

A judicial-proceeding privilege is conduct-regulating. "[T]he purpose of a common law or statutory privilege is the regulation of defamatory conduct that occurs within a state's borders." *Block v. First Blood Associates*, 691 F.Supp. 685, 698 (S.D.N.Y. 1988). California privileges statements made during the course of litigation—including settlement negotiations—in order to encourage free access to its courts, an unhampered adversary process, and candid discussions concerning settlement. *See Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1132–33, 270 Cal.Rptr. 1, 791 P.2d 587 (1990). California attaches such importance to this policy that the privilege extends to all claims except those for malicious prosecution. *Id.; see also Silberg*, 50 Cal.3d at 215, 266 Cal.Rptr. 638, 786 P.2d 365 ("To effectuate its vital pur-

poses, the litigation privilege is held to be absolute in nature.").

Although Connecticut's privilege is not as far-reaching as California's, it too regulates conduct. The policy underlying the Connecticut privilege "'is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements.'" *Petyan v. Ellis,* 510 A.2d at 1338 (quoting *Circus Circus Hotels, Inc. v. Witherspoon,* 99 Nev. 56, 60, 657 P.2d 101 (1983)). New Jersey's judicial-proceeding privilege serves a similar purpose. *See Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 N.J. 552, 558, 117 A.2d 889 (1955); *De Vivo v. Ascher,* 228 N.J.Super. 453, 550 A.2d 163 (App.Div.1988), *certif. denied,* 114 N.J. 482, 555 A.2d 607 (1989).

The judicial-proceeding privilege would lose its force if weight were given to the domicile of the parties or the place of injury in determining choice of law. Were the law of some other state to be applied in the case of California's judicial-proceeding privilege, for example, the incentive of parties to California litigation to rely upon that privilege would be gravely undermined because they cannot ensure that ensuing tort litigation will occur in California. To the contrary, they can be sure that, if the law of, say, the forum state, were to be applied, plaintiffs would always bring the actions in a forum with a narrow privilege. We must, therefore, apply the law of the locus state.

Harris and AroChem argue that Connecticut is the locus state, because it is the state where any injury resulting from the defamation occurred. In support, they rely upon the following passage from *Schultz:* "[W]hen the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679. However, Harris' and AroChem's reliance on this statement is misplaced. In *Schultz,* the New York Court of Appeals applied New Jersey's charitable immunity law to bar a claim for wrongful death and psychological injury. First, based on the rule laid down in the quoted passage, the court held that the locus of the tort was New Jersey—the place where the injury occurred. The court then noted New York's minimal interest—its only contacts were as the forum state and as the place of the tortious conduct. The court concluded that "[s]tanding alone, [New York's] interests are insufficient to warrant application of New York law, at least when the relevant issue is a loss-distribution rule … *rather than one regulating conduct.*" *Id.* (emphasis added). As noted, the California rule of privilege regulates conduct and, even assuming that injuries suffered by Harris and AroChem occurred in Connecticut, California's interests prevail.

■ Under California law, an actionable defamatory statement must be both false and unprivileged. Cal.Civ.Code §§ 44(b), 46 (Deering 1991). A communication is privileged if it is made during a judicial proceeding. Cal.Civ.Code § 47(b)(2) (Deering 1991). This privilege applies "to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg,* 50 Cal.3d at 212, 266 Cal.Rptr. 638, 786 P.2d 365. All four of these requirements are met here.

First, the Los Angeles negotiations unquestionably involved settlement of ongoing litigation between Victory and Wells. *See, e.g., Rosenthal v. Irell & Manella,* 135 Cal.App.3d 121, 126, 185 Cal.Rptr. 92 (2d Dist.1982); *see also Silberg,* 50 Cal.3d at 212, 266 Cal.Rptr. 638, 786 P.2d 365 (privilege applies "even though the publication is made outside the courtroom and no function of the court or its officers is involved").

Second, although not a litigant, Buirkle was a participant in the relevant proceedings. The Joint Litigation Agreement gave Buirkle a large stake in the outcome of the proceedings that were at issue during the December negotiations. He is thus pro-

tected by California's privilege. *See Doctors' Co. v. Superior Court*, 225 Cal. App.3d 1284, 1295–96, 275 Cal.Rptr. 674 (3d Dist.1990) (privilege extends to insurers because of their stake in outcome of litigation), *rev. denied.*

The third requirement—that the communication be made in furtherance of the objects of the litigation—is also met. This requirement demands only that the communication "not be extraneous to the action." *Silberg*, 50 Cal.3d at 220, 266 Cal.Rptr. 638, 786 P.2d 365. The primary purpose of the ongoing California litigation was to resolve whether Victory had to or would sell its interests in AroChem to Wells rather than Harris. Buirkle's statements during the December negotiations were in furtherance of this purpose.

Finally, the communications at issue were logically related to the California litigation. Indeed, Buirkle's statements were made in order to encourage Victory to settle that litigation. Such communications satisfy the fourth requirement.

Buirkle's statements are thus privileged under California law, and are not actionable. Judge Stanton therefore properly granted a directed verdict against Harris and AroChem on their defamation claim.

### 2. *Tortious Interference Claims*

Harris and AroChem also contend that Buirkle engaged in a tortious course of conduct aside from his defamatory but privileged statements, which interfered with Harris' and AroChem's relationship with Victory. In support of this claim they point to the Joint Litigation Agreement, in which Buirkle agreed to finance "litigation expenses and related costs" of Wells. In addition, they allege that Buirkle "bankrolled" Wells' letter-writing campaign against Harris. They argue that these actions are evidence of a tortious scheme engaged in by Buirkle, and that the district court improperly directed a verdict.

 We disagree. Under California and Connecticut law a valid tortious interference claim requires proof that the defendant engaged in independently tortious activities. *See Pacific Gas & Elec. Co.*, 50

Cal.3d at 1126, 270 Cal.Rptr. 1, 791 P.2d 587; *Weiss v. Wiederlight*, 208 Conn. 525, 535–36, 546 A.2d 216 (1988); *see also Levin v. Kuhn Loeb & Co.*, 174 N.J.Super. 560, 573, 417 A.2d 79 (App.Div.1980) (element of tortious interference claim is "the intentional commission of wrongful act without justification or excuse"). However, no evidence of any such act, other than the privileged conversations, was offered. It is not independently tortious to finance another's litigation. *See Pacific Gas & Elec. Co.*, 50 Cal.3d at 1136, 270 Cal.Rptr. 1, 791 P.2d 587 ("[W]e have no public policy against the funding of litigation by outsiders.... If any person who induced another to bring a lawsuit involving a colorable claim could be liable in tort, free access to the courts could be choked off with an assiduous search for unnamed parties."); *see also Blake v. Levy*, 191 Conn. 257, 464 A.2d 52 (1983).

As to the letter writing, Harris and AroChem have proffered no evidence that Buirkle, rather than Wells, was involved in sending the letters, other than Buirkle's knowledge that some or all of the letters were in fact sent. Moreover, no causal relationship between the letters and the collapse of the Harris/Victory Agreement was shown so far as Wells' correspondence with Chase, Drexel, and OCFI is concerned. With regard to the letter to Victory threatening litigation, there is nothing to indicate that it gave Victory pause, in contrast to the meeting in Los Angeles, the content of which is privileged. Harris and AroChem have thus failed to demonstrate that Buirkle committed any independently tortious acts that interfered with their relationship with Victory, and the district judge correctly directed a verdict against them on these claims.

Affirmed.