97 F.3d 640
 Richard H. KROCK; Frederick J. De Angelis; Karl E. Case;
Robert D. McNally; Stephen J. Browne, as trustees of
Wedgestone Financial, a Massachusetts business trust,
Plaintiffs-Appellants Cross-Appellees,
v.
Alan W. LIPSAY; Norman E. Blankman; Rose Diamond; Helene
Newman; David B. Pall; David Halperin; Arnold
Rosenwasser; Sue Anne F. Emerson; Carola Duncan; Bernard
Tannenbaum; Donald O. Stein; Carol Feuer; Ellen S.
Buczko; Louis V. Greco, Jr.; CP Grecay Corp.; College
Point Associates; Richard Ferrara; Earnest R. Field;
Theodore J. Malvin and Joseph J. Blake and Associates, Inc.,
Defendants-Appellees,
Peter R. Gray, Defendant-Appellee Cross-Appellant.
 Nos. 1138, 1654, Dockets 95-7621, 95-7901.
 United States Court of Appeals,
Second Circuit.
 Argued April 8, 1996.
Decided Sept. 23, 1996.
 
 Stuart E. Abrams, Frankel & Abrams, New York City (Sandor Frankel, Al J. Daniel, Jr. on the brief), for appellants-cross-appellees Richard H. Krock, et al.
 Sheldon M. Krupnick, Krupnick & Goldman, Garden City, NY, for appellees Alan W. Lipsay, et al.
 Stewart D. Aaron, Dorsey & Whitney P.L.L.P., New York City, for appellees Rose Diamond, et al.
 Luigi P. De Maio, Crocco & De Maio, P.C., New York City, for appellee Richard Ferrara and appellee-cross-appellant Peter R. Gray.
 Before: KEARSE and ALTIMARI, Circuit Judges, and JOHNSON,* District Judge.
 ALTIMARI, Circuit Judge:
 
 
 1
 Wedgestone Financial ("Wedgestone") appeals from a judgment of the United States District Court for the Southern District of New York (Weinstein, J.), after a jury trial, finding that 1) the defendants had not committed fraud when they acquired a loan from Wedgestone secured by property in New York, and 2) dismissing Wedgestone's equitable claims for constructive trust, unjust enrichment, and fraudulent conveyance. Wedgestone asserts that the district court erred generally in applying New York law to the controversy at hand and specifically in instructing the jury that Wedgestone's failure to investigate could vitiate the defendants' alleged fraud. Defendant Peter R. Gray ("Gray"), against whom the district court enforced a $4.3 million personal guarantee, cross-appeals, asserting that because Wedgestone failed to commence the district court proceeding within ninety days of delivery of the deed on the New York property securing the loan, it was barred by § 1371 of New York's Real Property Actions and Proceedings Law ("RPAPL") from seeking any deficiency judgment in federal court. We hold that, even if the district court erred in applying New York law, we find that any error was harmless and affirm the judgment below. Moreover, although RPAPL § 1371 may serve as a bar to future deficiency judgments, Wedgestone had received express permission to bring the present action in a prior state court judgment against, among others, cross-appellant Gray. Because Gray did not appeal that state court judgment, Wedgestone was clearly justified in bringing this action. Accordingly, we affirm the deficiency judgment against Gray as well.
 
 BACKGROUND
 
 2
 Wedgestone is a business trust organized under the laws of Massachusetts, with its principal place of business in Massachusetts. Wedgestone's business involves making short-term commercial loans, secured by real estate. As a result of the short-term, speculative nature of Wedgestone's loans, Wedgestone 1) charges high interest rates, 2) collects the interest on the loans up front, and 3) secures all its loans with real estate and personal guarantees. According to Wedgestone, it is not in a position to rely on the long-term success of the borrower in order to ensure repayment; consequently, the value of the real estate securing the loan is of particular importance when determining the viability of such loans.
 
 
 3
 In early December of 1987, Wedgestone was solicited for a loan from Sonnenblick-Goldman Corp., a well-known mortgage broker. The solicitation was for an $8 million loan for the College Point Associates ("CPA"),[1] a New York partnership, to be secured by undeveloped property located in the College Point section of Queens. In the Sonnenblick-Goldman brochure soliciting the loan, the undeveloped property was described as 42 acres of waterfront property. The brochure represented that the loan was sought for the proposed development of a 220 unit waterfront condominium complex, a 98 room hotel and restaurant, and a 350 slip marina. According to the brochure, the land could be developed "as-of-right."
 
 
 4
 Accompanying the brochure was an appraisal of the property by Joseph J. Blake & Associates, stating that the property was 42 acres and could be "constructed as of right." The Blake appraisal, which indicated that it had been prepared expressly for CPA, concluded that the property had a value of $16.4 million. In addition to the Blake appraisal, Wedgestone hired an independent evaluator to determine the value of the property. Because the CPA property was abutted by vacant parcels of land, Wedgestone's evaluator was unable to independently determine the acreage of the property. Thus, the evaluator relied upon the acreage information provided in the brochure and valued the property at approximately $11 million.
 
 
 5
 Believing the property to consist of 42 acres and believing no further permits were required to develop the land, Wedgestone approved a loan for $6.3 million in mid-December of 1987. The loan was to be secured by the waterfront property and by personal guarantees for $4.3 million each from Louis Greco ("Greco") and Peter Gray. Upon approval of the loan, Wedgestone referred the closing to the Boston law firm of Goodwin, Proctor & Hoar ("Goodwin").
 
 
 6
 At Goodwin, a corporate attorney undertook to acquire the titles, appraisals, and other documents necessary for the closing. On December 21, 1987, Gray traced the metes and bounds of the property with Wedgestone's counsel. While the attorney noted that more of the property was underwater than had been previously represented, she did not bother to calculate the actual acreage of the parcel of land. Nor did she carefully examine the closing documents which included, among other things, title reports and other papers indicating that the land was subject to significant restrictions on development. Specifically, the closing binder contained a consent order that stated, "CPA shall not undertake, nor consent to, any development.... on any portion of the subject property located within the jurisdiction of [the Department of Environmental Conservation ("DEC") ] unless DEC has been notified of and consented to such development." The title to the property also required that development meet with the prior approval of the Board of Estimates and with the discretionary approval of the New York City Planning Commission. Despite these obvious zoning restrictions, the transaction went forward.
 
 
 7
 On December 24, 1987, the transaction closed in New York City. The mortgage document executed by Greco and Gray contained the following choice-of-law provision:
 
 
 8
 This mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, except and only to the extent of procedural matters related to the perfection and enforcement by Mortgagee of its rights and remedies against the Property which matters shall be governed by the laws of the state in which the Property is located.
 
 
 9
 Upon receiving the loan, Blankman and Lipsay bought out the remaining partners and became the sole partners of CPA along with Grecay, which was owned by Greco and Gray.
 
 
 10
 On June 22, 1988, when the loan became due, CPA defaulted. Accordingly, Wedgestone commenced a foreclosure action in New York Supreme Court, Queens County against all of the original CPA partners (the "CPA partners") except the Diamond defendants. Upon foreclosing, Wedgestone discovered that the CPA property only consisted of 21 acres and was subject to serious restrictions on development. As a result of the size and zoning restrictions, the property was only worth $1.6 million (according to a later valuation by Magistrate Judge Ross) and not the $16.4 million as appraised by Blake & Associates, nor the $11 million as appraised by Wedgestone's evaluator. The New York Supreme Court authorized foreclosure and in its final judgment included the following language:
 
 
 11
 pursuant to RPAPL § 1301, and in lieu of the normal deficiency judgment procedures provided in RPAPL § 1371, Wedgestone is hereby given permission to maintain a separate action to recover any deficiency remaining, if the proceeds of the sale are insufficient to pay the amount due Wedgestone together with all the interest and costs as aforesaid, against any of the defendants or any other person or persons.
 
 
 12
 None of the parties to the New York State foreclosure action appealed the final judgment. The property was subsequently sold to Wedgestone for $500,000. Accordingly, Wedgestone brought this federal action for fraud, constructive trust, unjust enrichment, and fraudulent conveyance, and to enforce the personal guarantees against Greco and Gray.
 
 
 13
 Wedgestone's fraud claim was tried to a jury. At trial, Wedgestone argued that the misrepresentations concerning the acreage and zoning of the land were fraudulent. The CPA partners' principal defense was that Wedgestone and its lawyers were negligent in failing to detect the misstatements on their own. The district court determined that New York law applied and instructed the jury that:
 
 
 14
 One to whom an alleged false representation is made may not rely on that representation if he had reason to know it was false. Specifically, if the plaintiff has the means available to it of knowing by the exercise of ordinary intelligence or the usual effort in its line of business, the truth of the representations, you should consider whether plaintiff should have made reasonable use of those means. If the plaintiff does not make reasonable use of those means, it cannot recover on the basis that it was induced to enter into the transaction by misrepresentations.
 
 
 15
 If, however, a defendant deliberately took action designed to deliberately divert plaintiffs, its attorneys or agents from an investigation that would have been undertaken by them, in order to hide critical facts from the plaintiff so that the plaintiff would not protect its rights, and the plaintiff was so diverted as a result, you could find that plaintiff's reliance on that defendant's act was justified.
 
 
 16
 On December 14, 1994, the jury returned a general verdict against Wedgestone on its fraud claim. The district court then considered the equitable claims and determined that Wedgestone could not sustain its assertions of constructive trust, unjust enrichment, or fraudulent conveyance. The district court entered two final judgments, the first enforcing the $4.3 million guarantees against Greco and Gray, and the second finding against the plaintiffs on all counts and dismissing their remaining claims.
 
 
 17
 Wedgestone appealed the district court's decision, alleging that 1) the district court's application of New York law was erroneous, 2) the district court improperly instructed the jury on fraud, and 3) the district court erred in dismissing its equitable claims. Gray cross-appealed, contending that because Wedgestone failed to bring its deficiency proceeding within 90 days of delivery of the deed, Wedgestone was barred from seeking deficiency relief against him under RPAPL § 1371.DISCUSSION
 
 1. Applicable Laws
 
 18
 It is well-settled that, in diversity cases, federal courts must look to the laws of the forum state to resolve issues regarding conflicts of law. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941). Since this suit was brought in the Eastern District of New York, New York law properly determines whether Massachusetts law should control in the present dispute.
 
 A. Choice-of-Law Provision
 
 19
 Wedgestone contends that the district court erred in applying New York law in light of the choice-of-law provision in its loan agreement with the CPA partners which specified that Massachusetts law was to control. Although New York law gives full effect to parties' choice-of-law provisions, see Woodling v. Garrett Corp., 813 F.2d 543, 551 (2d Cir.1987), the language in the loan documents between CPA and Wedgestone does not apply to the case at hand. Under New York law, a choice-of-law provision indicating that the contract will be governed by a certain body of law does not dispositively determine that law which will govern a claim of fraud arising incident to the contract. See Plymack v. Copley Pharm., Inc., 1995 WL 606272 at * 5 (S.D.N.Y.1995) (Under New York law, "[a] contractual choice of law provision ... does not bind the parties with respect to non-contractual causes of action."); Rosenberg v. Pillsbury Co., 718 F.Supp. 1146, 1150 (S.D.N.Y.1989) ("While [a choice-of-law] provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort."); Klock v. Lehman Bros. Kuhn Loeb Inc., 584 F.Supp. 210, 215 (S.D.N.Y.1984) ("[I]t has been held in New York that a contractual choice of law provision governs only a cause of action sounding in contract.") (citing Knieriemen v. Bache Halsey Stuart Shields, Inc., 74 A.D.2d 290, 427 N.Y.S.2d 10, 12-13 (1st Dep't), lv. denied, 50 N.Y.2d 1021, 431 N.Y.S.2d 812, 410 N.E.2d 745 (1980)). Cf. In re Banister, 737 F.2d 225, 227 n. 3 (2d Cir.) (noting that although "[t]he choice of law provision ... applies North Carolina law to 'the contract[,]'.... [n]either party has urged the application of North Carolina law to the issue of tort liability"), cert. denied, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984).
 
 
 20
 Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be "sufficiently broad" as to encompass the entire relationship between the contracting parties. Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir.1994). In the case at hand, the choice-of-law provision in the parties' mortgage document stated only that "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." We see no way such language can be read broadly enough to apply to fraudulent misrepresentation. Thus, the district court properly looked to the jurisprudence of New York to determine the body of law properly applicable to the present controversy.
 
 B. Interest Analysis
 
 21
 In the absence of an applicable choice-of-law provision, "New York has adopted an 'interest analysis,' which requires that [ ] 'the law of the jurisdiction having the greatest interest in the litigation ... be applied.' " Kalb, Voorhis & Co. v. American Fin. Corp., 8 F.3d 130, 132 (2d Cir.1993) (quoting Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 300 N.Y.S.2d 817, 823, 248 N.E.2d 576, 582 (1969)). See AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir.1992). As New York law makes clear, "[c]ontacts obtain significance only to the extent that they relate to the policies and purposes sought to be vindicated by the conflicting laws." Miller v. Miller, 22 N.Y.2d 12, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 880 (1968) (quoting In re Crichton, 20 N.Y.2d 124, 281 N.Y.S.2d 811, 818 n. 8, 228 N.E.2d 799, 806 n. 8 (1967)). Specifically, "[t]wo separate inquiries are ... required to determine the greater interest: (1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss." Padula v. Lilarn Properties Corp., 84 N.Y.2d 519, 620 N.Y.S.2d 310, 311, 644 N.E.2d 1001, 1002 (1994) (citing Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95-96, 480 N.E.2d 679, 684-85 (1985)).
 
 
 22
 In all interest analyses, "the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." AroChem, 968 F.2d at 270 (quoting Schultz, 491 N.Y.S.2d at 95, 480 N.E.2d at 684). Accord Neumeier v. Kuehner, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 67-68, 286 N.E.2d 454, 457-58 (1972). The respective importance of each of those contacts is determined by the nature of the law in question. Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws, see Padula, 620 N.Y.S.2d at 311, 644 N.E.2d at 1002, Schultz, 491 N.Y.S.2d at 95-96, 480 N.E.2d at 684-85, whereas those cases concerning loss allocation will turn in significant part on the domiciles of the parties, see AroChem, 968 F.2d at 270, Schultz, 491 N.Y.S.2d at 96, 480 N.E.2d at 685. Thus, because the case at hand concerns laws regulating allegedly fraudulent conduct, the proper body of law to be applied turns on the locus of the tort.
 
 
 23
 New York courts have not directly ruled on which state's substantive law is to be applied to a fraud claim. It may well be, as the appellant contends, that New York courts would apply the substantive law of Massachusetts because, while the alleged fraud occurred in New York, the plaintiffs suffered their injuries in Massachusetts. See Schultz, 491 N.Y.S.2d at 94, 480 N.E.2d at 683 (in the context of a negligent supervision claim, the "locus ... is determined by where the plaintiff's injuries occurred"); Globe Communications Corp. v. R.C.S. Rizzoli Periodici, S.p.A., 729 F.Supp. 973 (S.D.N.Y.1990) (applying Schultz to a fraud claim); cf. Smith Barney, Harris Upham & Co. v. Luckie, 85 N.Y.2d 193, 623 N.Y.S.2d 800, 808, 647 N.E.2d 1308, 1316 (in the context of applying New York's borrowing statute, N.Y.Civ.Prac.L. & R. § 202, fraud claims are governed by the law "where the injury occurred--generally, the place where the investors resided and sustained the economic impact of the loss"), cert. denied, --- U.S. ----, 116 S.Ct. 59, 133 L.Ed.2d 23 (1995); Klock, 584 F.Supp. at 215 (in context of applying New York's borrowing statute, court noted that "[t]o the extent plaintiff became a poorer man, he became a poorer Connecticut resident"). However, we need not resolve the issue because even assuming that Massachusetts law applied, the error in the district court's instructions was harmless as explained directly below.
 
 2. Harmless Error
 
 24
 Assuming, without deciding the issue, that the district court erred in relying upon New York law in structuring its jury instructions, that error in the context of the present case was harmless. See Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 312, 106 S.Ct. 2537, 2545-46, 91 L.Ed.2d 249 (1986); United States v. Masotto, 73 F.3d 1233, 1238 (2d Cir.1996) ("An erroneous instruction requires a new trial unless the error is harmless."). While Massachusetts' legal standard concerning fraud differs from that applied in New York, the outcome under both standards is the same. Accordingly, we affirm the judgment of the district court.
 
 
 25
 Unlike New York law in which a party has a duty in certain circumstances to exercise ordinary intelligence to ascertain the truth of a representation, see Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 602, 157 N.E.2d 597, 600 (1959), Massachusetts law makes clear that the "failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation." Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 937 (1st Cir.1985). To sustain a claim for fraudulent misrepresentation under Massachusetts law, however, reliance upon such representations must be reasonable. Thus, "reliance on 'preposterous or palpably false' representations vitiates a misrepresentation claim." Damon v. Sun Co., 87 F.3d 1467, 1480 (1st Cir.1996) (quoting Roadmaster Indus., Inc. v. Columbia Mfg. Co., 893 F.Supp. 1162, 1179 (D.Mass.1995) (in turn quoting Zimmerman v. Kent, 31 Mass.App.Ct. 72, 575 N.E.2d 70, 76 (1991))).
 
 
 26
 It is clear that, at the time of the closing, CPA's prior representations concerning the acreage of the property and its incumbent zoning restrictions were palpably false. Regardless of the nature of CPA's earlier representations, the official documents provided by CPA in support of the closing easily revealed the accurate size of the property and all of its encumbrances. Although Massachusetts law requires no duty to investigate material representations that have been made in the course of business dealings, a party may not rely upon previously-made false representations once the truth of the matter has come to light. See Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33 (1st Cir.1988) ("Notwithstanding [defendant's] express written statement to the contrary and petitioner's express written acknowledgement ... petitioner now asks us to hold that he acted reasonably in relying on the earlier oral statement made.... This we cannot do."); Knight v. Brodnax, 1994 WL 51635 at * 3 (D.Mass.1994) (Because defendant made clear in written agreements that he was not the owner of the objects in question, the district court held that "plaintiffs cannot now claim that defendant made false statements of ownership to induce them to act."). By choosing to ignore that information which flatly contradicted prior representations, Wedgestone vitiated its fraud claim.
 
 
 27
 At the time of the closing, Wedgestone had in its possession several documents that made clear the actual acreage of that land as well as the fact that numerous zoning restrictions encumbered CPA's property. The title to the land expressly contradicted Wedgestone's belief that the land was unencumbered by restrictions on development; specifically, the title stated that any development required the prior approval of the Board of Estimates as well as the discretionary approval of the New York City Planning Commission. Moreover, among the closing documents was a consent decree with the Department of Environmental Conservation requiring the DEC's approval of any development on CPA's waterfront property.
 
 
 28
 With respect to the acreage of the land, Wedgestone had a map specifying the metes and bounds of the property. In fact, Wedgestone's attorney had even traced those boundaries with Gray prior to the closing and noted that more of the property was under water than Wedgestone had previously believed. Despite holding a precise description of the property and noting some discrepancy in the ratio of dry to wet land, Wedgestone never did the simple arithmetic necessary to discover that the land was, in fact, only 21 acres.[2] Such mathematics are hardly the equivalent of further investigation. To the extent that Wedgestone was not aware of the actual acreage at the time of the closing, it was only out of willful ignorance, cf. J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1260 (1st Cir.1996) ("Unsophisticated or not, plaintiffs cannot shroud themselves in ignorance or expect that their unsophistication will thoroughly excuse their lack of diligence...."), and Wedgestone could not reasonably rely upon CPA's earlier representations that the property was twice as large.
 
 
 29
 In light of the explicit information in Wedgestone's possession at the time of the closing, the earlier representations made by CPA were "palpably false." Because, under Massachusetts law, Wedgestone may not rely upon such clearly inaccurate representations, its claim of fraud must fail. Accordingly, even if the district court erroneously instructed the jury on New York law, such error was harmless in light of the discussion above.
 
 3. RPAPL § 1371
 
 30
 Because Wedgestone did not bring its federal action within ninety days of the delivery of the deed, Gray cross-appeals contending that it was improper for the district court to enforce the personal guarantee against him. Wedgestone's foreclosure action in state court was brought pursuant to Article 13 of the RPAPL. Section 1371 thereunder specifies both the process and timing by which a foreclosing party may seek a deficiency judgment:
 
 
 31
 1. If a person who is liable to the plaintiff for the payment of the debt secured by the mortgage is made a defendant in the action, and has appeared or has been personally served with the summons, the final judgment may award payment by him of the whole residue, or so much thereof as the court may determine to be just and equitable, of the debt remaining unsatisfied, after a sale of the mortgaged property and the application of the proceeds, pursuant to the directions contained in such judgment, the amount thereof to be determined by the court as herein provided.
 
 
 32
 2. Simultaneously with the making of a motion for an order confirming the sale, provided such motion is made within ninety days after the date of the consummation of the sale by the delivery of the proper deed of conveyance to the purchaser, the party to whom such residue shall be owing may make a motion in the action for leave to enter a deficiency judgment upon notice to the party against whom such judgment is sought or the attorney who shall have appeared for such party in such action.
 
 
 33
 * * * * * *
 
 
 34
 3. If no motion for a deficiency judgment shall be made as herein prescribed the proceeds of the sale regardless of amount shall be deemed to be in full satisfaction of the mortgage debt and no right to recover any deficiency in any action or proceeding shall exist.
 
 
 35
 RPAPL § 1371 (emphasis added). According to Gray, paragraph three of § 1371 makes clear that once the ninety days had passed, the $500,000 Wedgestone received for the foreclosed property should have been "deemed to be in full satisfaction of the mortgage debt." RPAPL § 1371(3).
 
 
 36
 Despite Gray's assertion, it is quite clear that § 1371 cannot serve as a bar to the present judgment. The period of limitations under § 1371 is "procedural and not jurisdictional," Mortgagee Affiliates, Inc. v. Jerder Realty Corp., 62 A.D.2d 591, 406 N.Y.S.2d 326, 327 (2d Dep't 1978), aff'd, 47 N.Y.2d 796, 417 N.Y.S.2d 930, 391 N.E.2d 1011 (1979); while the failure to seek a deficiency judgment within ninety days of delivery of the deed is traditionally treated by the New York courts as a complete bar to further recovery, the failure to timely seek a deficiency is waivable and may only be raised at the outset of such a deficiency proceeding. Id. at 327-28.
 
 
 37
 At the conclusion of Wedgestone's state court action, to which Gray was a party, the court issued a final judgment explicitly stating that "in lieu of the normal deficiency judgment procedures provided in RPAPL § 1371," Wedgestone could commence another proceeding to recover any deficiency remaining. Gray did not appeal that final judgment but rather allowed the ninety day period of limitations to run before raising his objection in federal court. We will not tolerate such gamesmanship. The state court's grant of leave to file this action was both final and binding and such resort to § 1371's period of limitations is unavailing in this Court. See Antonsen v. Ward, 943 F.2d 198, 201 (2d Cir.1991) (noting that federal courts are bound by final state court judgments).
 
 CONCLUSION
 
 38
 We have considered all of the appellants' arguments before us and find them to be unavailing. For the reasons stated above, the judgment of the district court is hereby affirmed.
 
 
 
 *
 The Honorable Sterling Johnson, Jr., United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 The Diamond defendants, a subgroup of the defendants in this case, argued at trial that CPA was in fact three separate limited partnerships. Specifically, the Diamond defendants argued that the CPA partnerships consisted of: CPA # 1, made up of Blankman, Lipsay, and the Diamond defendants (Diamond, Stein, Tannenbaum, Duncan, Field, Newman, Pall, Halperin, Rosenwasser, Feuer, Buczko, and Emerson); CPA # 2, made up of Blankman and Lipsay; and CPA # 3, made up of Blankman, Lipsay, and CP Grecay Corp. (a corporation owned by Greco and Gray). The Diamond defendants argue on appeal that they may not be held liable for anything that CPA # 3 did because they were only members of CPA # 1 and the loan was used to buy them out of the partnership. Because we affirm the district court's judgment against Wedgestone, we need not address the separateness or unity of the various CPA partners
 
 
 [2]
 As Alan J. Blocher--an expert in the field of commercial mortgage, finance and banking practices--testified, the true acreage of a piece of property can be calculated in "a couple of minutes from [a description of] the meets [sic] and bound [sic]."