[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case involves the "cash" purchase of a newly developed "shopping center" which was to be almost exclusively devoted to automobile repair and services.[1]
The success which purchaser anticipated never materialized. Seller's guarantee of the tenants' rent payments was soon dishonored and purchaser had to find new tenants at lower rates.
Some parties whose liability might seem clear have become defunct and/or judgment proof. The case thus centers upon buyer's plaintiff's claims against the listing broker and the "showing" broker.[2]
 Skeletal Facts
In 1988, semi-retired Norwalk real estate investor Donald St. John[3]
informed real estate broker, defendant Linda Landan that he was interested in a property which would produce a 10% net annual rate of return without managerial effort on his part. (Plaintiff St. John had had modest experience with this broker before).
In the late summer of 1988, Ms. Landan presented a "brochure"[4] to Mr. St. John which she had obtained from the defendant Farley Company of Hartford relating to a shopping center project in Torrington, apparently to be known as the "All Care Convenience Center", under development by a company known as Court `N Yards, whose principal was one Harvey Maron.
Solely upon the content of the brochure, without additional substantive input from Ms. Landan, a letter was sent by Ms. Landan (d.b.a. Realty Resources) on September 8, 1988, to Farley Company on Mr. St. John's behalf, containing an offer of $3,000,000. (Defendant's Exhibit F-C.)[5]
The offer was said to be "Non-contingent" an apparent reference to there being no need for buyer to borrow and "based on the previous CT Page 16219 information that you presented to me." (Id.)
Additionally, Landan wrote:
 "The leases will have to be guaranteed as they are presented, and the space that is vacant will need to be filled with the tenants that they are negotiating with. If they can not fill the space, we will have to discuss this matter. We can close this deal as soon as the tenants start paying rent. We only need seven days to close."
A meeting was arranged which took place in Hartford one week later on September 15, 1988. Close upon the outset of this meeting, Mr. St. John and developer Maron adjourned to an inner office while the brokers remained with each other to discuss potential commission splits.
Plaintiff St. John makes claim to no further relied-upon representations arising from this meeting, either from Farley people, Ms. Landan or from developer-seller Maron.
The September 15, 1988 discussion between Maron and plaintiff produced an agreed upon a selling price of $3,175,000.
It was after this meeting that plaintiff, broker Landan and plaintiff's lawyer. James Farrell drove in a rented limousine to Torrington to see the 2.13 acre parcel for the first time. The examination was somewhat cursory and plaintiff was able to see its three buildings in their varied states of completion.
Ultimately, a closing took place on November 18, 1988. Between the September 15, 1988 meeting/viewing and the closing (which plaintiff did not attend), plaintiff personally undertook no investigation of any kind and personally asked no questions of any broker or seller.
During this September-to-closing period all dealings regarding the purchase were left to Attorney Farrell. All of his interactions were with sellers; none of meaning were with the defendant brokers.
This time span was to see Mr. Farrell requesting, receiving and reviewing a large number of leases and financial statements of tenants, actual and prospective. Additionally, Mr. Farrell prepared rent guarantees for seller's execution and received and reviewed financial statements regarding seller-guarantors.
Ultimately, in the absence of Mr. St. John, Mr. Farrell proceeded to CT Page 16220 close on November 18, 1988 on plaintiff's behalf, with knowledge of the various areas of incomplete construction, tenancy and occupancy.
Ultimately, upon taking title to the premises, little went well. Some tenants never moved in, some never paid. The rent guarantees by seller-developer soon came to be dishonored and plaintiff encountered difficulty re-renting vacant spots at rates the original leases were slated to produce and at rates referenced as locally prevailing in a brochure footnote.
Plaintiff became unable to successfully pursue legal remedies against the absent, defunct or judgment proof seller defendants and the case came on to this court against broker Landan and listing broker Farley Company.
The case, as tried, focused much attention upon the contents of the "brochure". As one analyzes the allegations of misrepresentation, three major areas must receive attention:
 (a) the brochure's discussion of the project at hand and of the auto services industry in general;
 (b) the legal and factual effect of the seller's rental guarantee as it relates (or doesn't) to Farley and as it may have diverted or diluted plaintiff's reliance upon the brochure;
 (c) the brochure's page 14 footnote re: going commercial rental rates in Torrington as of July 22, 1988.
Ultimately this court will come to conclude that the brochure's contents, i.e., those not contained in the page 14 footnote, are of the least significance in this case.
 Basic Legal Discussion
A.) Negligent Misrerepresentation: "[Our Supreme Court] has long recognized liability for negligent misrepresentation. . . . [It has been held that] even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." (Internal quotation marks omitted.) Citino v.Redevelopment Agency, 51 Conn. App. 262, 273, 721 A.2d 1197 (1998).
"The governing principles are set forth in . . . § 552 of the Restatement Second of Torts (1979): One who, in the course of his CT Page 16221 business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) Id.
"Reliance is an essential element of an action for innocent misrepresentation." Paull v. Coughlin, 39 Conn. Sup. 467, 468, 466 A.2d 347
(1983), citing Johnson v. Healy, 176 Conn. 97, 405 A.2d 54 (1978). "The question whether the plaintiff relied on the misrepresentations of the defendant is ordinarily a matter of fact, to be decided by the trial court." Time Finance Corporation v. Clark, 6 Conn. Cir. Ct. 200, 205-06, 269 A.2d 88 (1968).
The law also requires that the claimant must prove justifiable reliance on a misrepresentation. Citino v. Redevelopment Agency, supra,51 Conn. App. 275. An occasional usage in this area speaks of "reasonable reliance." (Emphasis added.) See Trifiro v. New York LifeIns. Co., 845 F.2d 30, 33 (1st Cir. 1988). See also Krock v. Lipsay,97 F.3d 640, 647 (2nd Cir. 1996)
B.) Fraudulent Misrepresentation: "The four essential elements of fraud are (1) that a false representation of fact was made; (2) that the party making the representation knew it to be false; (3) that the representation was made to induce action by the other party; and (4) that the other party did so act to her detriment. . . . Fraud bynondisclosure, which expands on the first three of these four elements, involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak." (Emphasis added.)Pospisil v. Pospisil, 59 Conn. App. 446, 450, 757 A.2d 655 (2000), citingGelinas v. Gelinas, 10 Conn. App. 167, 173, 522 A.2d 295 (1987), cert. denied, 204 Conn. 802, 525 A.2d 965 (1987); Papile v. Robinson,
4 Conn. Cir. Ct. 307, 311, 231 A.2d 91 (1967). With regard to false statements of fact, one should note that as long ago as 1912 our Supreme Court said, in a case brought against a real estate broker acting for a seller: "The law does not fasten responsibility upon one for expression ofopinion as to matters which, in their nature, are contingent and uncertain." (Emphasis added; internal quotation marks omitted.) Bradley v.Oviatt, 86 Conn. 63,67, 84 A. 321 (1912).
"Fraud generally is not to be presumed, and must be strictly proven by clear, precise and unequivocal evidence." Alaimo v. Rover, 188 Conn. 36,39, 448 A.2d 207 (1982). "[F]raud must be proven by a standard more exacting than a fair preponderance of the evidence." (Internal quotation CT Page 16222 marks omitted.) Id. "Under either formulation, a plaintiff's burden cannot be equated with the fair preponderance standard of proof for ordinary civil actions." Id.
Fraudulent misrepresentation is very similar to negligent misrepresentation with the exception that claimant must prove that the representor knew what he conveyed was false and claimant must prove that the purpose was to induce the defrauded one into the detrimental action. As noted, more difficult for plaintiff is that this strict set of elements must be proven by an elevated standard usually articulated as "clear, precise and unequivocal." (Internal quotation marks omitted.)Alaimo v. Rover, supra, 188 Conn. 39. The standard has alternatively been articulated as "clear and convincing." Black v. Goodwin, Loomis Britton, Inc., 239 Conn. 144, 163, 681 A.2d 293 (1996).
C.) Reliance
Basically, the principles of law as to reliance appear to be no different in fraudulent and negligent misrepresentation contexts. For example, in a fraud context, it has been stated that reliance is "an essential element of an action for damages for such representations, and the failure of the plaintiffs to establish that reliance is fatal to their action." Jacques v. Roy, 144 Conn. 737, 128 A.2d 530 (1956).
In a truism that ought to be applicable in either a negligent or fraudulent misrepresentation context, it has been held that "a party may not rely upon previously-made false representations once the truth of the matter has come to light." Krock v. Lipsay, supra, 97 F.3d 647.
In the various places herein, where the court articulates its conclusions, it is seen that most of the references to reliance note the court's findings that one does not perceive a visible unbroken and undiminished track of reliance. The court has not specifically utilized the rhetoric of justifiable reliance or reasonable reliance, as such,.but the same conclusions would obtain if it had. Instead, in various instances, the court finds reliance either not proven, abandoned or replaced. In other places, the allegation of misrepresentation itself has been found unproven.
D.) Imputed Knowledge and Conduct
In the several weeks leading up to the November closing, plaintiff's attorney, James Farrell, undertook something of an investigation or review, involving reviews of financials and leases and the drafting of guarantees. The information gleaned, and the diminution of various alleged reliances, where extant, must be attributed to plaintiff through CT Page 16223 his attorney.
"The knowledge and admissions of an attorney are imputed to his client." Lafayette Bank Trust Co. v. Aetna Casualty Surety Co.,177 Conn. 137, 140, 411 A.2d 937 (1979). "The general rule is that the acts of an attorney are imputed to a client when they are performed in the furtherance of the business for which the attorney has been retained." Allen v. Nissley, 184 Conn. 539, 542-43, 440 A.2d 231 (1981). "The knowledge of an attorney is imputed to the client unless circumstances render it certain or probable that the attorney will disregard the duty to communicate the material facts to his clients." (Internal quotation marks omitted.) Skyler Limited Partnership v. S.P.Douthett Co., 18 Conn. App. 245, 248, 557 A.2d 927 (1989), cert. denied, 212 Conn. 802, 560 A.2d 984 (1989). "Notice or knowledge of an attorney, acquired during the time he or she is acting within the scope of his or her employment, is imputed to the client." 7 Am.Jur.2d, Attorneys at Law § 154.
 I. The "Brochure"
The brochure is appended hereto (Appendix I). Appendix II treats in great detail each page of the brochure, the testimony of plaintiff with regard to it and court commentary thereon.
The brochure contains 20 pages.[6] Of these, 5 are without specific regard to this Torrington project or to this developer. Four more pages relate to Court `N Yards as a developer and not specifically as to this Torrington endeavor. Thus, 9 do not focus on Torrington, and 11 do.
Of these Torrington-related 11, 2 are balance sheets of (tenant) McKlean's; 2 are asset/liability sheets on tenant Autospa Corporation; 4 pages are "Torrington Tenant Financial Information"; 1 page is a "Torrington Tenant List"; 1 page is "Torrington Annual Rents"; 1 page is the Offer to Sell.
The court has come to conclude that these brochure pages cannot form the sound basis for an action of negligent or fraudulent misrepresentation against brokerage firm Farley.
The overall rationale for this conclusion is multi-faceted. Many things can be said about the literally dozens or scores of utterances in the brochure. (Slicing thinly, one could even count beyond a hundred). But, in the end, virtually every allegation of misrepresentation can be met with one or more of the following rejoinders.
 — the utterance is not a representation at CT Page 16224 all;
 — the utterance is not about this particular parcel or project in any but the most generic sense;
 — the testimony and evidence fails to establish any specific reliance thereupon;
— the utterance has not been proven false anyway.
The Appendix reader will see that the plaintiff states he was given to "feel comfortable" with apparent "homework" he felt was manifest in the brochure's language; however, no falsity was proven which could be said to walk hand in hand with subsequent reliance, with the reliance flowing undiverted or undiminished to the time of closing and the sufferance of harm.
Later, this opinion will discuss the other events and factors which this court concludes shrinks the significance of this brochure or displaces any reliance by plaintiff thereupon. Among these will be the guarantees of rent made by the seller and selling entities (whose liability is not before this court) and the work done by the buyer's attorney prior to the closing, which work was both investigative and protective in nature.
Also to be discussed is the one remaining portion of the brochure which is not treated in this section. That part is a footnote on page 14. It is the only portion of the brochure admittedly authored (rather than merely passed on) by Farley Company and deals with prevailing rental rates in the area in July, 1988.
The caring reader might note that the court has not treated the difficult subject of whether a broker's responsibility is to utter only what it has determined to be the truth, or whether it is to avoid conveying that which is known false or suspect, or to label that which is unverified. This opinion has not fixed the appropriate legal duty on such a spectrum line of arguable obligations. One might first note that, except for the going rate footnote on page 14, the brochure was primarily the promoter-seller's utterance.[7] While responsibility for all of it may or may not reside in Farley, this opinion rests largely on a string of plaintiff's proof failures — things not representations; things not misrepresentations; reliances not proven; reliances placed elsewhere; misrepresentations, if any, investigated and "uncovered" prior to closing. Thus, it has not been necessary to precisely articulate a duty where the facts would reveal it not to have been breached under a variety of formulations. CT Page 16225
 II. The Work of Attorney James Farrell on Plaintiff's Behalf
Mr. St. John stepped away (figuratively and literally) for the bulk of the period between the September 15, 1988 Hartford meeting/Torrington viewing and the November 18, 1988 closing.
During this period, Mr. Farrell was the sole active representative of putative buyer St. John.
The Court believes it can be fairly said that the investigative work and review by Attorney Farrell on plaintiff's behalf had an impact which: (a) probably shrunk plaintiff's reliance upon the brochure and upon the going rate statements of local rent in the brochure's page 14 footnote and (b) probably enlarged plaintiff's reliance upon the rental guarantees.
As noted, supra, p. 4, virtually all of the interaction after September 15, 1988 was between the selling entities and officers on the one hand and Attorney Farrell on the other with none occurring with either defendant broker (except that frequently one of the brokers would be a mere conduit of material from seller to buyer's counsel.)
A thorough review of the documentary artifacts of this period brings one to the inescapable conclusion that any reliance Mr. St. John might have placed (or misplaced) upon the contents of the brochure is rendered somewhat interrupted by the new "replacement" or supplemental information sought, received and ostensibly somewhat relied upon by Mr. Farrell, all of which goes to become buyer's imputed knowledge and which, significantly, emanates from sources other than the defendant brokers.
Farrell's involvement with this transaction began in the late summer of 1988 when his client, Mr. St. John, asked him to examine the brochure Landan had provided. Farrell stated that he had represented the plaintiff partnership Clifford St. John and Sons, and thus Mr. Donald St. John, in previous real estate transactions. He was not asked by St. John to give financial advice but to make sure everything was legally correct, to "dot the i's and cross the t's" (Transcript, June 13, 1997, page 59).
As noted, on September 15, 1988 Farrell, St. John, his daughter Jill St. John, and Thomas Horton traveled by limousine to the Farley Company's office in Hartford. After an initial discussion with Farley's Thomas Worth on behalf of the sellers about the "automall" concept and prospective tenants for the Torrington property, (some of whose leases Mr. Farrell had already received) (Transcript, James Farrell, May 14, CT Page 16226 1997, pages 141-142), Mr. St. John and Harvey Maron privately adjourned to work out an agreement as to price and brokers' commissions. Attorney Farrell, though in Hartford, was not a party to this principals session. (No claim has been made that Mr. Worth made any extra-brochure misrepresentations in the Hartford discussion.
Shortly, Mr. Farrell drafted a contract that included provisions for a tax-free exchange to accomplish transfer of the property.[8]
Additionally, Farrell drafted documents memorializing agreements that Maron, as grantor of the Marchild Trust and as Chairman of Court `N Yards, would guarantee tenant leases for 5 years. Maron guaranteed that in the event that any tenant should fail to fulfill its lease obligations, Court `N Yards would fulfill the financial obligations of the delinquent tenant (s)
Apparently, the rental guarantee progression began early on. It's origin is not identically described in the evidence, but what is perfectly clear is that rental guarantees are explicitly sought in St. John's initial offer, written by defendant Landan. (Exhibit F-C).[9]
Farrell's pre-closing investigation also sought information about the financial status of the guarantor(s) as well as information about the prospective tenants and their leases.
By the time of closing on November 18, 1988, a not insubstantial amount of the construction on the property had yet to be completed and several of the tenants had not yet moved in. Some of the spaces on the site had not even been leased by this time.[10]
These facts had to have increased the significance of the rental guarantees.[11] Having requested and received a five year rent guarantee for virtually all of the leases,[12] as well as information on the financial status of the guarantors and prospective tenants, St. John closed on the deal aware that significant construction remained unfinished and that several tenants had not yet moved in.
While St. John was out of town during most of this period, information gathered by his delegate, attorney and representative, James Farrell, must be imputed to him. St. John testified that he relied on Farrell to handle these aspect of the transaction. (Transcript, June 13, 1997, pages 64-65).
Another significance of the knowledge learned by Farrell during this two month period beyond the more obvious probable diminution of reliance on the bulk of the brochure, is that it potentially diminishes his CT Page 16227 reliance or has to be deemed to have diminished his reliance (and therefore that of his client) upon representations as to rental rates in the brochure's page 14 footnote.
As just suggested, somewhat similarly, as Farrell learned more about the prospective tenants, his reliance (and that of his client) upon rental rate representations in the brochure, they having then decided to close on the transaction, ought to have been correspondingly reduced, otherwise closing would be delayed or canceled. The court realizes there is a potential for an exact opposite conclusion, that buyer went ahead, despite the more recently received non-brochure information, because of
the rental rate footnote. This court does not so conclude, but it should be noted that this is of little significance given that, as will be seen, the court does not find the footnote to be proven to be actionable misrepresentation anyway. Therefore, Farrell's "investigation" likely resulted in a diminution of the alleged two-pronged reliance upon the brochure.
To illuminate this probable shift from "investigation" to "diminished reliance", it is helpful to consider the likely significance of what was gathered and/or learned by Farrell during this period.[13]
Farrell testified to Landan's counsel of his review of the assets of seller-Maron's "Marchild Trust." In his testimony, he was uncertain as to its holdings and felt not qualified to say if they were substantial; (Transcript, June 6, 1997, pp. 16-17). Farrell testified that he and his client had Exhibit 1 to determine the financial assets of Court `N Yards. He was uncertain whether other financial statements of this entity were in his possession pre-closing. When questioned by Attorney Shepro as to whether because Plaintiff did close, he was satisfied with the guarantees, Farrell responded : "I think they closed the deal because they were satisfied with the deal. The guarantees were part of the deal." (Id. at 18.) When pressed as to how important a part of the deal the guarantees were, Farrell responded, "I don't know. That is something you have to ask of Mr. Donald St. John. It wasn't my call. He got all the financial information. He made the decision. . . ." Nevertheless, Farrell admitted that had he suspected fraud he would" . . . have certainly told them not to proceed." (Id.) (The trier was not made aware of Mr. St. John personally receiving financials outside the brochure after its receipt.)
Based upon Farrell's testimony, it is apparent that his investigation in the weeks leading up to and including the date of closing, yielded up no information on the financial status of the guarantors which caused him (and by extension St. John) to question the ability of the guarantors to fulfill their guarantees. CT Page 16228
As to Farrell's investigation into the status of the prospective tenants, his review of the solvency of tenants consisted mostly of that contained in the brochure. Additionally, however, certified and uncertified financial statements on tenants were provided at closing (Exhibits 9, 8, 7, 6, 3. All but Exhibit 3 were "certified" by Maron).
Farrell testified that one condition set forth in the purchase contract was that the tenants would be occupying their leased spaces in the building by the closing date. In this vein Farrell stated that "(t)his was supposed to be a . . . no hassle deal. Everyone was supposed to be paying rent. When the property didn't get completed in time and the tenants weren't in place in time, these guarantees became more important because Maron was going to pay the rent. Court `N Yards salary (sic) [management salary] was going to pay the rent until they finished the space. It was a requirement that this be a performance project, and that was the reason St. John got involved in it. . . ." (Id. at 21). Based upon this testimony, it is evident that when Farrell's knowledge of the status of the tenants and the unfinished nature of the site itself is combined with St. John's expectation that this be a "no hassle", income producing deal, by the time of closing the rental guarantees were significantly relied upon by St. John.[14]
As noted, the financial status of the guarantors was scrutinized after a fashion by Attorney Farrell. The ranks of the guarantors had been expanded from Court `N Yards alone to include the Marchild Trust at Farrell's request. The court feels that the guarantees achieved a prominence upon which substantial or primary reliance was placed. The concomitant effect, of course, is to shrink the significance of the text
of the brochure. of course, it must be remembered that the breach of those guarantees is not by defendants Farley Company or Landan.
It is true that Donald St. John testified that the going rate footnote was his ultimate, bottom-line reliance. (Transcript, June 13, 1997, pages 153-56.) The court feels this conclusion cannot be taken as entirely so. While honestly believed at the time of trial testimony, years after the sad denouement, plaintiff's perspective has to be influenced toward fixing liability on the defendant(s) in this trial who are not judgment proof. That is to say, the guarantees are believed by the court to have loomed much larger to buyer-investor St. John in real-life 1988 than to witness-plaintiff St. John in trial-life 1997.
In the same sense, one may understand why plaintiff at trial spoke of the guarantee as some sort of strange unknown item that suddenly and surprisingly appeared before him (see citations in footnote 25, supra) when instead it was writ large in the very first response Linda Landan CT Page 16229 made on his behalf to sellers (Exhibit F-C, the letter of September 8, 1988). One cannot conclude, without at least some evidence, that she would have done this on her own. Thus, its being minimized in plaintiff's trial testimony leaves as possible the prospect that the trial presented plaintiff with the guarantees from seller being problematic in litigation against the brokers. Thus, in a subconscious deference to self-service, plaintiff is perceived by the court to have obeyed the imperative that he cannot concede heavy reliance upon the guarantee failures of a judgment-proof guarantor.
Additionally, the very same notion that generally sold Mr. St. John on the vitality of seller-developer's burgeoning project has to have been a factor in placing weight upon their guarantees.
It would defy logic to conclude anything other than that the guarantees rose in prominence, while the entire brochure (except the going rate footnote) shrunk to a point approaching insignificance.
 III. Brochure Footnote Re Prevailing Rental Rates
The brochure contains a footnote on page 14 (as Exhibit 1 came to be paginated) which has the unique characteristic of being of the Farley Company's own authorship. (Transcript, Thomas Worth, June 27, 1997, pages 147-48.).
It states:
 "* * * As of July 22, 1988, rents on the Winsted Road in Torrington were quoted at $15.50 and $16.00 per square foot. Coldwell Banker of Torrington (482-5588) is leasing 1,000-2,500 square foot spaces in the new Oriental Pearl Plaza at $15.50 and space in another Winsted Road plaza for $16.00 with no tenant improvements. The higher rentals for 6-Twelve and McKleans reflect the fact that they are completely "turn-key" operations.
Plaintiff claims that this going rate was his "whole safety net." (Transcript, June 11, 1997, pp. 90, 111-12.) That is, if he were to suffer misfortune, have the guarantee(s) fail, and have to find his own tenants, and become hands on property manager, he would receive rates comparable to those originally expected.
Richard Schlott testified for plaintiff and opined that the rental rate of this project would have been more accurately pegged at $8 to $10 per CT Page 16230 square foot. As a result, he stated that the value of Mr. St. John's new property, utilizing the net income method of appraisal, was only $1,874,250 at the time of purchase, not the $3,175,000 plaintiff paid.
Edward Heberger, testified for the defendant Farley Company, and stated that the market rate for this development was $13.50 to $15 per square foot, figures approaching those stated in the footnote.
For reasons to be explored, infra, this court has concluded that defendant's expert more clearly apprehended the correct state of affairs that prevailed. Even if the warring contentions were in equipoise, the court's conclusion is that plaintiff's expert's contentions failed to prevail by a preponderance.[15]
Before we turn to qualitative assessment of the expert's conclusions, small items ought to be pulled out and examined. The rental rate representations are assigned no life span. That is, no specific claim is made as to how long such rates were suggested to last. of course, when an appraisal is needed for a retrospective look back to one historical date, no one expects that it be traced forward, toward the present. But in the context present here, that void takes on at least some meaning. This case thus contains two elements, really, which lend import to this absence of a forward-looking time frame. On one side is the 5-year rent guarantee plaintiff secured from the developer. On the other is a sharp downturn in the real estate market in the early post-closing period.
With regard to the 5-year guarantee: it must be remembered that a central task of this court is to determine where plaintiff's reliance(s) lay. As a result, that task calls for, inter alia, a comparison of a 5-year guarantee of unpaid rents versus a single-date time frame of rental rates on other properties somewhat different in kind. (What was supposed to be attractive about the developer's concept here was its very different nature.)
The rental rate footnote does not purport to historically look back and state that rates in the area have long been stable, showing consistent progressive increases in value. Nor, either, as noted, does it state that these rates will be expected to prevail at such a plateau, at least, for years to come (much less 5 years to come). The point here is not that one would expect a "going rate" snapshot to contain such a history and prognosis. Rather, the silence on such helps one assess whether it was as relied upon as the 5 year guarantee.[16]
In the section, infra, when the guarantees are discussed in more detail, it will be seen that plaintiff, individually and through Attorney Farrell, appears to have attached far more significance to the guarantees CT Page 16231 than to this footnote's text. Indeed, the record of this long trial reveals not a shred of evidence nor a single word of testimony about reliance being placed, pre-closing, upon the going rate footnote; not a word from any witness about plaintiff being happy with the footnote's ostensible good news (whereas, contra, such evidence is present on the guarantee).[17]
As noted, supra, the second aspect, one which also lends a temporal cast to these issues, is the 1989 economic downturn frequently discussed at trial. It might be contended, not without logic, that a rising tide lifts all boats and conversely a falling one lowers them. This may be too glib in context. It is necessary to ignore this economic downturn if one is to accord plaintiff recovery based on the footnote, for would not all bets be off in the event of a recession? That is, was this unusual property to be less or more susceptible — a shining star through hard times or the first to become a white elephant? of course these questions are not answered in this trial and may be largely unanswerable in real life. But the very fact that they are unanswered serves to occlude any clear path to recovery of damages. Surely, a plaintiff could not recover for years of rent at a falsely elevated rate, with damages calculations flying in the face of an actual recession which the rate footnote could not be read to protect against.
We must now return to the appraisers and the merits of their opinions to see first if the footnote's numbers were, by the indirection the appraisers employed, proven wrong. If they were not so proven, then it does not matter what significance their falsity might have possessed.
A few words about each expert and their work precede a more detailed review.
Plaintiff's Mr. Schlott is a licensed broker with 25 years of appraising experience. He performed his study in July 1989 at the request of Attorney Farrell, seeking to value the property as of the closing, November 18, 1988, seven months prior.
Defendant Farley's Mr. Heberger possessed 40 years' experience as a real estate consultant, owning his own real estate appraisal firm at the time of his work regarding this property. He had been employed for two years, at the time of his 1997 testimony, by Farley-Whittier Division of Whittier Partners, which had merged with the Farley Company and had appraised this property initially in July, 1987 for prospective buyer DeForest Smith. An updated appraisal was performed in August, 1988 on behalf of this property's developer, Harvey Maron.
Mr. Schlott, as noted, did his work seven to eight months CT Page 16232 post-closing. He told the court that the 20,825 square feet Mr. St. John bought "should have leased in the $8-10 range as of the closing date." He said that the "net income" would be, for an average $9 per square foot, $187,425 for the year. (Transcript, June 26, 1997, pp. 110-11; Exhibit 69, Schlott's Report).
Edward Heberger's two appraisals, occurred in July, 1987 on behalf of DeForest Smith, and for Harvey Maron in August of 1988. (Transcript, July 1, 1997, p. 172.) Heberger's appraisal valued area rental rates at $13.50 to $15 per square foot and concluded that it would not be unreasonable for the subject Torrington property to garner $15 per square foot. (Id. at pages 111 and 172)
The plaintiff's expert and defendant Farley's expert were roundly attacked upon cross-examination and, further, in the post-trial briefs.[18] After innumerable hours of digesting transcript and studying the reports and briefs, the court has come to conclude that neither expert was left sufficiently intact to be deemed to have carried the day upon a preponderance. In such a standoff, of course, the party bearing the burden of proof suffers. On a few points, the court was inclined to accord more weight to defendant's Heberger and, obviously, in these areas, plaintiff would also have failed to carry his burden.
We turn now to some of the points that had an impact on the aforesaid conclusion of the court.
Plaintiff's expert conceded that the existence of a rent guarantee of a five-year duration would be or could be "very valuable", depending, of course, upon the strength of the guarantor. Yet, none of his "comparable" local properties possessed this "feature". (Transcript, June 27, 1997, page 37).[19] Mr. Schlott's failure to weigh what was then (prior to closing) an ostensibly "very valuable" aspect of the transaction somewhat undermines the reliability of his valuation of Mr. St. John's purchase.
The court is frank to concede that the vagaries of the various methods and approaches of appraisal are not easily discerned; however, it was slightly disconcerting to see that Mr. Schlott valued the physical plant at $1,680,000 "without any operating income." (Schlott's report, Plaintiff's Exhibit 69, not paginated, third page from end.) His ultimate valuation was thus only $194,250 more in a circumstance where there existed a guarantee (which he did not countenance) which would have alone produced, net to plaintiff, approximately $260,739.50 every year for five
years.[20]
Plaintiff, in its post trial brief, attacks defense expert Heberger for ignoring the earlier contract to buy between this seller and DeForest CT Page 16233 Smith.[21] At this juncture, however, where the court is addressing points which appear to undermine the accuracy of Mr. Schlott's appraisal, this ostensibly anti-Heberger point is a place where Schlott suffers as well. That is, Schlott affixes his plaintiff-favoring low $1,875,000 value as of the November, 1988 closing, when the recent history of this very development reveals an apparent willingness of Smith to pay $425,000more than Schlott's number, and, at a time when the project was in a more primitive stage of development.
The accuracy of Mr. Schlott's analysis is further clouded by his apparently misplaced reliance upon an ostensibly comparable property across the street which sold for $850,000 — approximately 25% of the price paid by Mr. St. John. Schlott seems to imply on page 3 of his July 28, 1989 report that this comparable property was remodeled andthen sold at a fraction of the price paid by Mr. St. John in approximately the same time context as the subject property. Defendant Farley points out on page 8 of its brief that Plaintiff's own Exhibit 79, tax assessor's sheet, indicates that this comparable property was purchased in early 1989 and remodeled after purchase in March of that year. Further reducing this property's usefulness as a comparable is the fact that, rehabilitation aside, the piece brought the low price it did in the economic downturn of late 1988 and early 1989.[22]
Another factor which serves to slightly dilute the court's confidence in Schlott's appraisal is the fact that it was conducted just over a year after the brochure footnote indicated a market rental rate of $15.50 to $16.00 per square foot. (Schlott's appraisal report is dated July 28, 1989, while the original footnote pertained to rental rates as of July 22, 1988.)
This court is not suggesting that the work of Farley's expert, Mr. Heberger, has proven to be more credible in more areas than that of Schlott. Rather, his testimony and studies contain strengths and weaknesses which may at times rival or exceed propositions advanced by Mr. Schlott. It must be kept in mind, however, that it is for plaintiff to carry the day in establishing the falsity of the contents of the page 14 footnote. One can readily deem this footnote not proven to be a misrepresentation without having to adopt all or any of Mr. Heberger's assertions on behalf of defendant.
The court was not ultimately persuaded to accept Mr. Heberger's expert testimony regarding the value of the property, but some aspects of his appraisal tend to lend credence to a few of his conclusions. In contrast to Mr. Schlott, who apparently did not adequately weigh the rather unique nature of St. John's automall concept, Heberger at least purported to have considered it. Additionally, Heberger's analysis possessed a degree CT Page 16234 of thoroughness that was somewhat lacking in the Schlott appraisal. E.g., Heberger's evaluation involved two scenarios which took into consideration, first, potentially overvalued rental rates as well as, second, those which he deemed to be more realistic.
Likewise, his analysis was developed from a survey of local rental rates, both market rates (asking rates) as well as contract rates (leases that tenants had signed). Heberger testified that it was reasonable for him to utilize the asking rates in light of the strong market situation prevailing at the time, saying that area asking prices were being met.
While plaintiff critically observes that Heberger failed to take into consideration the DeForest Smith contract price when conducting his second appraisal which was for Harvey Maron, it must be noted that the Smith contract price was heavily contingent and, obviously never consummated. Heberger might be forgiven for failing to include this aspect.
One of the stronger features of the Heberger appraisal, especially when contrasted with Schlott's, is the fact that it took place nearly contemporaneously with the compilation of the brochure and its dated rental rate footnote. The appraisal therefore predates the onset of litigation and the economic downturn which has cast such a significant shadow over the entire chain of events and which downturn was surely a factor in Mr. St. John's difficulty in renting space at desirable rates. The time frame in which Heberger operated is therefore favorably contrasted with that of Schlott, who was only contacted after Mr. St. John decided to pursue the course of litigation and after the economic downturn of early 1989.[23]
Too, it is interesting that Heberger's study did not embrace the existence of the rental guarantees which came to exist after his work had been prepared. If Schlott's concession that these might have been "very valuable" were factored into the Heberger analysis, his valuation would arguably be higher yet.
Thus, although the Heberger study possesses some advantages over its rival, it is lacking in other respects. It should be noted at the outset, however, that the court did not feel compelled to accept the more conspiratorial aspects of plaintiff's negative characterization of the relationship between Heberger and Harvey Maron.[24] (See, e.g., plaintiff's brief at pages 47-48 and 66-67).
A flaw in Heberger's assessment is the fact that many of the comparable properties arguably lacked what many might deem to be truly comparable features. Heberger was willing to compare the subject auto-related CT Page 16235 property, which was less likely to be able to support more conventional retail activities, to very traditional commercial and retail properties when this property differed somewhat dramatically, with, for example, overhead garage doors, instead of "store fronts", present at many locations.
It is also true that Heberger did not seek to investigate the legitimacy of the leases Maron was "lining up."
After careful analysis and consideration, it is apparent to the court that Edward Heberger's appraisal contains characteristics which both tend to recommend the legitimacy of his conclusions as well as which would seem to undermine those same conclusions. This court has determined that although the Heberger appraisal contained many flaws, which could be enumerated at even greater length, Schlott's appraisal still did not carry the day in establishing plaintiff's claim. Plaintiff, through the use of the Schlott appraisal as well as its other means of proof, did not convince the court that the rental rate footnote constituted amisrepresentation. The respective appraisers were enlisted by the parties in order to justify each side's arguments regarding the true value of the property, yet the presentations of both contained serious weaknesses. Indeed, it seems that Mr. Heberger's appraisal was clouded by even more difficulties and potential flaws than those which plagued Schlott. Were the court compelled to tally the positive and negative characteristics of both appraisals, it may well be the case that Schlott's appraisal would earn slightly higher marks in such a contest. Yet to engage in such a detached reckoning of the various merits and demerits of the respective appraisers would obscure the fact that the court did not ultimately find Schlott convincing.
Moreover, the entire contest waged by the appraisers did not necessarily bear directly on the central aspect of the footnote issue — whether it can be fairly said to be a probable misrepresentation. While the efforts of both appraisers had the potential to have impact upon this central question, plaintiff did not demonstrate the superiority of its expert to the necessary degree and failed to convince the court that the footnote contained a genuine misrepresentation. Thus, even if plaintiff may have succeeded in winning the battle of the appraisers it did not win the war of convincing the court of the strength of its expert opinion. The contest of dueling appraisers can be said to have produced no winner.
It may be that each party had asked too much of its experts. That is to say, a simpler, more bifurcated approach might have been more persuasive. For example, an investigator's survey of the rental rates actually in effect within a certain geographic radius in the summer of CT Page 16236 1988 might have better illuminated the issue as to whether the footnote frankly purveyed blatant falsehood(s). Instead, the appraisers too quickly burdened themselves with the task of comparative valuation which was essentially a damages audit (i.e., the property was worth this much or that much less than Mr. St. John paid and a verdict equal to that discrepancy is necessary). This effort cast each into a swamp of contradictions, confusions (for everyone) and scarcely comparable "comparables" from which never emerged sufficient legal clarity on the threshold issue of whether the footnote was false. Apparently, neither side's expert ever called the footnote's identified source (whose telephone number is in said footnote) to see if Farley falsified.
Plaintiff strives to utilize "reality" as a support for its argument against the allegedly too high rates in the brochure's footnote. Plaintiff notes:
 "Given that the property couldn't be rented during the term of the Smith contract for $13.50 per foot and it couldn't be rented for $10.00 per foot after the closing, the estimate of value by Schlott seems to be in touch with reality." (Plaintiff's brief, page 70).
However, absent from plaintiff's argument is the fact that at the time Smith contracted to buy, construction had scarcely commenced and evidence does not reveal information about other real or potential tenants then available to Mr. Smith. Similarly unpersuasive is plaintiff's statement that the property did not rent at this rate after Mr. St. John closed on it. Mr. St. John's search for tenants did not begin in earnest untilafter the economic downturn had commenced in early 1989. These highly relevant factors have not been adequately taken into consideration by plaintiff in his attempt to advance the "reality" argument.
The defendants blame this downturn for a great deal of plaintiff's difficulty. Whether or not this is heavily so, this cloud has obstructed clear and easy analysis and harms the analyses of the appraisers.
 IV. The Guarantee(s)
Despite St. John's testimony that the rental guarantees were not an essential factor in his decision to proceed with the transaction, it is a fact that he sought the guarantees. It may have been so that his broker, Ms. Landan, initiated the idea. She certainly sought it first, in her letter conveying plaintiff's offer. While plaintiff had testified that it popped up unbidden,[25] its origin clearly dates back to Landan's letter. According to Ms. Landan's testimony, the handwritten reference to rental guarantees in the left margin of page 14 of the brochure was CT Page 16237 written by Ms. Landan herself. Landan's letter, St. John's initial offer on the property, made guarantees a necessary condition to the sale. By the date of closing, the rental guarantees were memorialized in writing by St. John's attorney, James Farrell, and the desire therefore and awareness thereof are to be imputed to him.
The rental guarantees were memorialized in two documents, both drafted by Farrell, and were offered by plaintiff as Exhibits 14 and 15. The two documents were both titled "Guaranty" and are virtually identical except for the guarantors. Exhibit 14 was guaranteed by Court `N Yards and was signed by Harvey Maron individually and as chairman of Court `N Yards. Exhibit 15 was guaranteed by the Marchild Trust and was signed by William Doran as trustee of the Marchild Trust and Harvey Maron in his capacity as grantor of the Marchild Trust. Both documents are dated November 18, 1988, the date of closing.[26] The guarantee is termed, in its own language, to be an inducement to Mr. St. John to acquire the property and was to run for five years commencing on November 1, 1988. The guarantors unconditionally guaranteed to Mr. St. John ". . . the prompt and punctual payment when due of the rent . . . with respect to the Leases of the Tenants of St. John located at 75 Winsted Road . . . a description of which are attached as Schedule A. . . ."
Further, the document states that Mr. St. John was not obligated to accept a new tenant for the rental spaces described in Schedule A until the guarantors agreed to guarantee such leases for the balance of the five year term. Mr. St. John's reliance upon the main text of the brochure is, as has been noted, consequently diminished and with it the liability of Farley. St. John's testimony regarding the nonessential nature of the rental guarantees is likely mistaken. It may be that plaintiff has long known his only case is against Farley and Landan. However, the court cannot ignore the fact that plaintiff, through his broker, insisted upon the inclusion of the rental guarantees.
The court's determination that Mr. St. John came to place significant reliance upon the rental guarantees is further bolstered by the testimony of his daughter, Dawn St. John, who was a property manager and bookkeeper for Clifford St. John and Sons. Additionally, she was responsible for collecting rent from tenants and for leasing to new tenants at the Torrington project, and for making sure that rents were collected from Maron pursuant to the guarantee(s). When questioned by the Court as to whether in the time leading up to the purchase of the property her father had spoken of the rental guarantees as a positive factor in the transaction, Mrs. St. John responded that from her point of view the rental guarantees would be ". . . great because I wouldn't have to be involved in the . . . everyday hands on collecting the rent." (Transcript, June 25, 1997, p. 97). When questioned by the court CT Page 16238 specifically as to her father's thoughts on the guarantee, Dawn St. John answered that she believed he ". . . thought it would be good as far as . . . the tax free exchange portion of it. . . . [a]nd the guarantee was something I believe he relied heavy on. In other words, for five years he wouldn't have to worry. He would have a passive income stream." (Id. at 97-98).
Another indicator of the relative significance plaintiff may have attache to the guarantees compared to the going rate brochure footnote is the fact that no check was made into the latter despite that said rental rate footnote contained its source's telephone numbers.
In the end, it is difficult to say whether St. John, through Attorney Farrell, learned enough about the financial status of the guarantors and the potential tenants to replace earlier possible reliance upon the brochure. Nevertheless, despite any possible misgivings or newly generated confidence in the reliability of those with whom he was dealing, the fact remains that St. John decided to close on the transaction. It is plaintiff's burden to prove that he relied significantly upon the brochure and less upon the rental guarantees. The court has concluded that plaintiff has failed to show an unbroken cord of reliance upon the brochure, in text or footnote.
It must be noted, too, that the idea of plaintiff downplaying the significance of the guarantees is inconsistent with his oft-stated, original, primary goal, to wit: a no-work, almost hands-off investment. The guarantee would have provided that. For plaintiff to state that more
reliance was placed upon the prevailing rate footnote is at leastinconsistent with this goal in that he would have had to become a tenant-hunting manager/landlord.[27]
 CONCLUSION
In sum, Mr. St. John was, as he believed, the victim of being sold a bill of goods — an idea whose time either had not come or was poorly or dishonestly nurtured. A measure of his harm befell him because he was so trusting and he was likely so trusting because he, personally, was so trustworthy. Yet, as things turned out, any tortious treatment was visited upon him by those now at the furthest remove from judicial grasp, leaving him with an uphill litigation against those hugely less malevolent. Of all the people involved, one would most readily rely upon Mr. St. John's handshake, but those who clearly betrayed him are gone beyond reach, and those within reach have not been proven culpable.
It has not been necessary to finely draw distinctions throughout regarding the liability of Landan versus that of Farley. With Landan CT Page 16239 being accused of no substantive misrepresentation beyond the brochure and not being connected to brochure preparations, a verdict which holds Farley Company not liable would by sheer force of logic exonerate her even more readily.
There is no corroboration to bolster the notion that plaintiff was more reliant on the broker's going rate footnote over the seller's guarantee. He investigated a lot more about the guarantee and guarantor; he sought, via Landan, the guarantee. The unsolicited footnote garnered little interest for all that the evidence reveals, despite that it might have been easier to superficially check it than to examine the finances of tenants and guarantors. (A start was readily proffered with the inclusion of the source's telephone number in said footnote).
The remainder of the brochure's text failed to provide a basis for plaintiff's claims for varied reasons: certain items purportedly relied upon were not representations at all; may others were not proved to bemisrepresentations; in several other areas, where the above two statements do not pertain, reliance was not proven or probable reliance was diverted or replaced by different things, most prominently the rent guarantees, the breach of which was not by the defendant brokers.
One must state the obvious ramifications. The failure to prove negligent misrepresentation carries with it the ever more obvious shortfall in establishing fraudulent misrepresentation with its even higher burden of proof. The CUTPA claim and that of unjust enrichment (regarding the brokers' commissions) cannot stand on the same evidence which failed plaintiff in the first two counts.
Verdict for defendants Farley and Landan on all counts.
The Court
By Nadeau, J.
 OPINION APPENDIX I INDUSTRY BACKGROUND INFORMATION
CT Page 16245
They are called "car courts", "auto malls" or "car care centers". They are shopping centers for auto aftermarket products and services that are no longer available in gas stations and often too costly at car dealerships. Pioneered mainly in the West and South, this new real estate concept offers both convenience and expert service for car owners.
The demand for automobile service has grown rapidly in recent years as the number of neighborhood service stations declined in the United States. Over 100,000 have closed since 1972 and the overwhelming majority of those that remain are self-service gasoline stations without repair facilities.
In spite of this decline, the basic demand for auto aftermarket services has increased because Americans are keeping their cars longer. The Average ownership of a car has risen from 4.9 years in 1979 to 6.9 years in 1985. The tremendous increase in families with two working adults has also increased the demand for fast, convenient auto repair. Also, the newer, fuel efficient engines require frequent maintenance and a specialist. Statistics show that home auto repair is declining because of environmental restrictions.
Auto care franchise businesses have been around for twenty years operating mostly as single service outlets in free-standing buildings. As land prices escalated, however, the cost for single service buildings became prohibitive. Today, smaller sites are not readily available and local zoning restrictions are becoming tighter and tend to exclude single service use. Consequently auto care franchises look to the auto mall developments. The sizes are pre-approved, the facilities efficiently constructed and as a result, cost competitive for auto service businesses. Also, the traffic flow higher than at single service outlets. A customer stopping by for one service is immediately exposed to the others. Court `N Cars tenants are coordinating their services so that two or more services can be provided with one visit or drop off.
 Summary of the Real Estate Investment Opportunity
Court `N Yards USA, Inc. is a developer of "car care centers." It searches for potential sites, researches them carefully and options qualified locations. All sites chosen are "prime retail properties," that is, the present demographics, traffic flows and adjacent shopping facilities give the optioned parcel value for several commercial uses. Construction commences only when Court `N Yards has signed leases for at least 60 per cent of the potential space.
The Company's "car courts" are between 15,000 sq. ft. and 25,000 sq. CT Page 16246 ft. with adequate parking and attractive landscaping. The company has researched the size of the bays and the offices needed for muffler shops, lubrication shops, engine repair and car washes. It has a standard architectural package which is modified slightly to fit each specific parcel and local municipal requirements.
The tenants are mainly national franchisors and their local franchisees. The leases are signed by both. The franchises typically invest $100,000 in tenant improvements and equipment and are very committed to their businesses. They borrow money, mortgage their homes and invest their savings in working capital to start these businesses. Nationally, only about 1.9% per cent of automotive product and service establishments owned by franchisees in 1986 discontinued. operations.
 Exhibit #2 Appendix V Discontinued Establishments Owned by Franchisees Number and Per Cent 1986 As a Per Cent Number of of Total Discontinued Establishments Establishments by Category
Automotive Products Services 594 1.9 Business Aids Services 2,014 4.4 Construction, Home Improvement 746 4.1 and Cleaning Services Convenience Stores 158 2.4 Educational Products Services 210 2.6 Restaurants (All Types) 1,435 2.7 Hotels, Motels Campgrounds 230 3.2 Laundry Dry Cleaning Services 69 3.1 Recreation, Entertainment Travel 177 2.4 Rental Services (Automobile Truck) 123 1.7 Retailing (Non-Food) 1,465 4.3 Retailing (Food, except Convenience Stores) 447 2.7
Source: Franchising in the Economy, 1986-1988 U.S. Department of Commerce
 APPENDIX V CT Page 16247 Trends in Industries Related to Court `N Yards, USA
U.S. Department of Commerce data indicates that all franchises of Automotive Products and Services (excluding car rentals) have increased in "number of establishments" from about 35,100 to about 41,500 between 1984 and 1988 or by 18 per cent. The dollar revenues of those franchises have risen from $9.3 billion to $13.7 billion or by 48 per cent in the same period.
The numbers of Gas Service Stations have declined (using the same report) from 132,000 to 112,000 during the 1984-88 period. This represents a decline of 18 per cent.
The estimated number of Convenience Stores in 1984 was 14,900. In 1988, the number of such stores is estimated to be 17,200, an increase of 15 per cent. The sales volume of Convenience Stores have risen by 32 per cent.
Exhibit #1 shows the data for each individual year as related to the above industry groups.
The Commerce Department also collected data for the franchising industry on the number of establishments that "discontinued operations". For the year 1986, franchisees in the Automotive Products and Services group had a discontinuance rate of about 1.9 per cent. With only one exception, franchisees in all other industry groups had discontinuance rates of between 2.4 per cent and 4.7 per cent. The management of Court `N Yards believes this low rate reflects the financial committment that the automotive service franchisee makes to their business and the relative growth in demand for these services. (See Exhibit #2.)
 Exhibit #1 Appendix V Comparative Growth in Numebr of Establishments and Sales 1984-88
 Per Cent Per Cent
 Estimated Projected Increase Four Year
 1984 1985 1986 1987 1988 (Decrease) Average
 1984-88
Automobile Products and Services
 Number of Establishments
 Franchisee Owned 30,761 31,840 31,912 34,283 36,277 18%
CT Page 16248
 Company Owned 4,350 4,632 4,851 5,010 5,190 19%
 Total 35,111 35,472 36,763 39,293 41,467 18% 4%
 Annual Sales Volume
 ($ millions) $9,286 $10,658 $11,300 $12,294 $13,739 48% 12%
Gasoline Service Stations
 Number of Establishments 132,080 124,600 120,510 115,820 112,000 (18%) (3%)
 Annual Sales Volume
 ($ millions) $100,997 $100,767 $86,618 $89,217 $91,894 (9%)
Convenience Stores
 Number of Establishments 14,960 15,141 15,524 16,298 17,211 15% 4%
Annual Sales Volume
 ($ millions) $10,292 $10,839 $11,278 $12,328 $13,561 32% 8%

Source: Franchising in the Economy, 1986-1988 U.S. Department of Commerce
Court `N Yards also builds a larger "All-Care Convenience Center" that has other "light retailing' in addition to car services. These provide important traffic draws such as convenience marts, mail services, dry cleaning and shoe repair. Car wash operations normally attract 300 to 800 customers per day. A 6-twelve convenience store attracts 800 to 1200 customers per day. In these 20,000 to 25,000 sq. ft. centers, one or both of these operations will provide the customer traffic necessary for thesuccess of all the tenants in the development.
Court `N Yards currently has one property available for sale that is near completion in Connecticut, one under construction in Florida and two optioned properties in North Carolina and South Carolina. In general, the Company is planning to sell its properties prior to commencingconstruction under a contract which protects the prospective investor.
The arrangements with the Investor will be structured as follows:
1. The Investor will approve the individual properties after an option is secured. A contract to purchase is signed.
2. Prior to commencing construction Court `N Yards will have leased at least 60% of the space.
3. The sale to the Investor will be consummated only when a project has a Certificate of Occupancy and is 95% leased with signed Estoppel CT Page 16249 Certificates.
4. The sale price will be set such that the net, net lease revenues will provide a return to the Investor of ten (10%) in the first two tears.
5. For years three through ten lease revenues increase between 3 per cent and 5 per cent each year (depending on the cost of living index.) Based on a 3 per cent rental increase, the projected minimum
annual return on the investment will be as follows:
Years 3 4 5 6 7 8 9 10
10.3% 10.6% 10.9% 11.3% 11.6% 11.9% 12.3% 12.7%
 If inflation remained at five (5) percent or higher for years two through nine, the maximum annual return on investments would be as follows:
Years 3 4 5 6 7 8 9 10
10.5% 11.0% 11.6% 12.2% 12.7% 13.4% 14.0% 14.7%
6. Court `N Yard USA wants to remain the manager of each car court. The Investor is, of course, free to choose their own property management firm if they wish. Property management will not be a primary profit center for Court `N Yards. Management wants the responsibility of maintaining the quality of the properties and of promoting the properties. It is in its long terra interest to assure that Court `N Car Centers are successful.
7. The tenant lease enables the Property Manaqer to coordinate permanent promotional programs for the car court. Such programs will continue at the tenants expense as long as those leasing two-thirds of the space concur. Court `N Yards plans to maintain a strong public relations staff to coordinate site promotion programs. Pre-opening publicity expenditures are part of the construction budget.
In addition to the long term value of the basic building and the land, an investor in the properties acquires certain leasehold improvements paid for by the tenants. These tenant expenditures include utilities to support operating equipment and modifications to the offices and bathrooms (not simply decoration.) The value of these investments may be $350,000 to $400,000.
 CONSOLIDATED BALANCE SEET MCKELANS, INCORPORATED AS OF JULY 31, 1987 CT Page 16250
Current Liabilities
Accounts Payable $ 89,465.41 Federal W/H Payable 2,835.42 State W/H Payable 244.10 Fica W/H Payable 10,244.19 Other W/H Payable 506.22 Other Taxes Payable 3,948.30
Total Current Liabilities $ 106,717.42
Notes Payable 10,568.00 Equipment Loans 69,818.00 Vehicle Loans 3,331.00 Mortgages 1.00
Total Other Liabilitis 83,718.00
Total Liabilities $ 190,435.42
Equity
Common Stock 1,000.00 Additional Paid in Capital 421,359.00 Retained earnings 758,028.09
Total Equity $1,180,387.09
Total Liabilities and Equity $1,370,822.51
 CONSOLIDATED BALANCE SHEET MCKLEANS, INCORPORATED AS OF JULY 31, 1987
ASSETS
Current Assets
Cash in Bank 110,710.00 Accounts Receiveable 290,207.00 Inventory 29,904.49 Utility Deposit 2,650.00 Prepaid Expenses 00.00
Total Current Assets $433,471.49 CT Page 16251
PROPERTY AND EQUIPMENT
Equipment deposits 203,918.00 Property and equipment less accumulated depreciation 566,931.30 Vehicles less accumulated depreciation 26,668.00 Leasehold Improvements less accumulated depreciation 135,543.72
Total Property and Equipment $933,061.02
Other Assets
Corporate Fees 823.00 Trademark 3,467.00
Total Other Assets 4,290.00
Total Assets $1,370,822.51
 AUTOSPA CORPORATION AND SUBSIDIARIES LIABILITIES AND STOCKHOLDERS EQUITY March 31, 1988 Current Liabilities
 Cash overdraft $ Notes payable — Bank 450,000 Current maturities of long term debt 389,000 Accounts payable, accrued expenses and other current liabilities 957,000
Total current liabilities 1,796,000
Long term debt 23,187,000
Stockholders' equity:
Common stock 119,000 CT Page 16252 Additional paid-in capital 8,438,000 Accumulated earnings (deficit) 361,000
8,918,000
 Less: Stock subscriptions receivable 75,000 Treasury stock 16,000
 91,000
Total Stockholders' Equity 9,009,000
Total Liabilities and Stockholders' Equity $33,992,000
 AUTOSPA CORPORATION AND SUBSIDIARIES CONSOLIDATED CONDENSED BALANCE SHEET (Unaudited) ASSETS March 31, 1988 Current assets: Cash and equivalents $6,145,000 Accounts and franchise fees receivable 1,077,000 Loans receivable — Officer — Notes receivable 98,000 Advance commissions receivable — Officer — Inventory 384,000 Net investment in direct finance leases (net of unearned income of $10,000 and $18,000) 72,000 Prepaid expenses and other current assets 298,074
Total current assets 8,074,000
Property and equipment, net of accumulated depreciation and amortization 4,834,000
Goodwill (Net of Amortization on $4,000) 340,000
Net investment in direct finance leases (net unearned income of $37,884,780 and $21,772,252) 14,463,000
Deferred registration costs finance costs CT Page 16253 (net of amortization of $45,082) 768,000
Other asstes 5,513,000
Total Assets $33,992,000
 TORRINGTON TENANT LIST
BASE INITIAL OPTION NAME SOFT RENT TERM PERIOD Autmotive Tenants
1. AutoSpa Tune-Up 1,840 $14.26 15 years 3/5 yr terms 2. AutoSpa Oil Lube 1,792 $14.26 15 years 3/5 yr terms 3. AutoSpa Car Wash 1,456 $14.26 15 years 3/5 yr terms 4. Ming of America 1,408 $13.50 15 years 3/5 yr terms 5. LifeGuard Brake 2,684 $17.00 10 years 2/5 yr terms 6. Novus Windshield Repair (negotiating) 2,039 $13.50 Convenience Tenants
1. Cape Cod Seafood 1,520 $13.50 5 years 2/5 yr terms 2. 6-Twelve 3,716 $20.00 10 years 2/5 yr terms 3. McKleans 2,262 $20.00 10 years 2/5 yr terms 4. Mail Boxes Etc USA (MBE) (negotiating) 2,112 $13.50
 AVERAGE BASE RENT: $15.38 per square foot
*** As of July 22, 1988, rents on the Winsted Road in Torrington were quoted at $15.50 and $16.00 per square foot. Coldwell Banker of Torrington (482-5588) is leasing 1,000-2,500 square foot spaces in the new Oriental Pearl Plaza at $15.50 and space in another Winsted Road plaza for $16.00 with no tenant improvements. The higher rentals for 6-Twelve and McKleans reflect the fact that they are completely "turn-key" operations
 TORRINGTON TENANT FINANCIAL INFORMATION
AUTOSPA CORPORATION
For the first nine months of operation for fiscal, 1983, AutoSpa reported revenues of 6.2 million and net income of $748,000. The revenues represent a 76% increase from the same time period in 1936. The revenue increase is due primarily to the addition of franchise locations.
According to Benjamin Zitron, AutoSpa chairman and president, 40% of the more than 12 million company shares outstanding are employee CT Page 16254 owned.
The initial franchise fee for AutoSpa That Ten Minute Oil Change Place is $25,000. The estimated average investment ranges from $55,000-$159,000. On going expenses payable to AutoSpa Corporation include advertising expenses equal to 4% of weekly gross sales revenues and royalties of 7% of weekly gross sales revenues. (Balance sheet attached)
6-TWELVE CONVENIENT MART
6-Twelve Convenience Mart was incorporated in 1984. Franchises have been offered since 1985 in Maryland and 1986 in Virginia. The franchise founder, Aris Mardirossian, emphasizes fast food, quality and service for consumers. Aris has recently sold 49 franchises in the Washington area which will be added to the 12 stores in total currently in operation. The new franchises in the Washington area are expected to all be open by the end of 1989.
The company reported revenues for the year ending March, 1988 of $435,000, which is 118% over prior year results.
The initial franchise fee is $30,000. The estimated average investment ranges from $250,000-$400,000. On going expenses payable to 6-Twelve include advertising expense equal to 2% of weekly gross sales revenue and royalties of 3, 4 or 5% of weekly gross sales revenues.
McKLEAN'S DRY CLEANING SYSTEMS
McKlean's has sold 25 franchises and has 3 company owned stores. The company reported revenues for the seven months ending July, 1987 of $1,516,547. There was a gross profit of $643,235. Net income for the same period was reported as $287,279.
The initial franchise fee is $20,000. The estimated average investment ranges from $168,000-$282,000. On going expenses payable to McKlean's include advertising expense equal to 1% of weekly gross sales and royalties of 5% of weekly gross sales revenues.
(See McKlean's Consolidates Balance Sheet attached.)
6-TWELVE CONVENIENT MART
In 1984, Aris Mardirossian had a "gentlemes's" agreement with Southland Corporation which franchises more than 7,000 7-Eleven convenient stores across the nation to lease a parcel of his land in Maryland for one of their stores. Then, at the last minute they reneged, Mr. Mardirossian CT Page 16255 built his awn convenience store on the site and called it 6-Twelve Quik Mart. First year revenues were more than $1.3 million with a 10% profit. In 1985, Mardirossian opened a third store and was preparing to franchise the operation when Southland Corperaticn accused him of "falsely suggesting some sort of affiliation with Southland's international 7-Eleven chain". "They have nothing to do with one another", insisted Mardirossian. He threatened a counter-suit on anti-trust grounds. There were months of litigation but Southland withdrew its complaint when Mardirossian agreed to change the colors of his 6-Twelve logo. But he was allowed to continue the convenience stare operation unchallenged and franchise the 6-Twelve concept.
The 6-Twelve Convenient Mart offers fast-food, fresh produce, deli and baked goods = addition to the usual items found in most convenience stores. There is a wider selection of food and products not often found in a convenience type outlet. The emphasis is on quality. The success of 6-Twelve is not based on imitation, but on improvement. Pin ball machines and adult magazines are not allowed. There is a genuine commitment to quality and service and 6-Twelve's prices are competitive with even supermarket chains.
McKLEAN'S DRY CLEANING SYSTEM
The Torrington Cleaners business is a franchise of McKleans Dry Cleaning system. McKleans was established in 1985 and has been a successful franchisor off upscale dry cleaners since 1986. The "Dry Kleaning by McKleans" concept means each store is custom designed for efficient work flow patterns and equipment placement. McKleans uses the latest technology in the dry cleaning industry to insure an efficient operation. They also use the most penetrating advertising to project a unique market image. This focus insures success for even the most inexperienced franchisee.
Dry cleaning constitutes one of the "most profitable business opportunities in the nation today. It is a service that is absolutely necessary in today's society and one that will continue to experience growth. The increasing use of natural fibers in casual and business wear requires professional care. More women have entered the work force, increasing their own wardrobes and decreasing time available for taking care of their own and their family's clothes. The number of dry cleaning retail centers has not increased in proportion to this new demand for dry cleaning service.
NOVUS WINDSHIELD REPAIR
Novus was established in 1972 as a revolutionary method to repair stone CT Page 16256 damages and scratched windshields. Since then, these methods have been perfected through Novus research and development. Now, up to 75% of all damaged windshields are repairable making this system a very popular and inexpensive alternative to replacement. Novus is a rapidly growing company with a network of franchises in the U.S. and Canada, with headquarters in Minneapolis. There, in addition to corporate offices, are full training facilities for franchisees, and laboratories far on-going research where the development staff continues to research new technology and improve services.
AUTOSPA CORPORATION
Autospa Corporation is a full service franchisor principally engaged in franchising, operating and developing AutoSpa service centers, which offer the convenience of a 10 minute oil change, 20 minute tune up, "touchless" car washing, Ming auto appearance and detailing, and tire flatproofing. All activities are supported by controlled subsidiaries including AutoSpa Realty Corporation, AutoSpa AutoMalls, Inc. AutoSpa Sales Corp., Ming of America, Inc., and AutoSpa Flatproof Corp. These subsidiaries manage operations, purchase or lease and develop real estate for use as AutoSpa-affiliated service centers or for use by other automotive aftermarket entities. They also distribute oil and other lubricants, parts, supplies and equipment to owned and franchised locations.
AutoSpa Inc. began in the franchised quick lube business seven years ago. They have approximately 300 locations nationwide. There are 100 quick lube franchises in 41 states. There are 45 Ming auto appearance centers are in operation, mostly west of the Mississippi. The car wash operation is a recent addition and only a few are operating. The tire flatproofing service is currently being tested in three centers.
Much. of the company's growth has been through acquisition. An agreement is currently being negotiated to purchase California-based Tune Up Masters Inc., with 240 company-owned centers. This acquisition would double the number of outlets controlled by the AutoSpa corporation. on March 15, 1983, AutoSpa Corporation announced that it had entered into a Purchase Agreement to acquire Pit Pros, Inc. a privately held Chicago-based franchisor of fast oil change centers. Pit Pros currently has 43 service centers located in Illinois, Indiana, Texas, and Pennsylavania. There are also another 43 Pit Pro franchisees for 42 pre-selected sites. This sale to AutoSpa is subject to a closing.
Autospa is planning to continue its strategy of rapid growth and expansion. Inc. Magazine named AutoSpa 57th in its annual Inc. 100: America's Fastest Growing Small Public Companies. CT Page 16257
 TORRINGTON TENANT DESCRIPTIONS
TORRINGTON LIFEGUARD BRAKE AND MUFFLER, INC.
Muffler and brake repair have been the mainstay of the automotive repair industry for many years. Lately, this segment off automotive service has experienced dynamic growth, especially in New England where both these essential car parts take a beating on crowded interstates and hilly back roads. Safe brakes are a must, but braking systems have become more complex and costly, not more durable. Lifeguard Muffler and Brake, Inc. is total under-car care: specialists in exhaust systems and computerized and anti-lock brakes. The emphasis is on the latest technology in and complete under-car service. As an independent business, Lifeguard can be cost competitive with the large chains and return a higher profit. Because they. are located in newly constructed service centers, Lifeguard outlets can readily adapt repair methods when automotive technology changes.
The Torrington location is the first of a series off Lifeguard Brake and Muffler facilities to open. To insure success, an experienced automotive service entrepreneur, who has successfully operated several automotive franchises in Fairfield County, will oversee the operation in its start-up phase.
CAPE COD SEAFOOD
Gary Franklin has always known he would own his own business one day. After school, he worked as a part-time, short-order cook. He not only learned a great deal about the restaurant business, but about preparing deep-fried foods. He realized that there could be a delicious, healthful alternative to the usual fast-food, burgers and fries. His childhood on Cape Cod instilled a love of fish and its proper preparation. Now, his first fast food seafood business will open in Torrington, Connecticut. Franklin will serve the Cape Cod specialties of his youth, chowder, fried clams, crab salad and more for eat-in or take-out.
MAIL BOXES Etc USA (MBE)
In direct response to increase postal rates, the public's dissatisfaction with the U.S. Postal System and an overwhelming demand for mailbox rentals, Mail Boxes Etc USA was born in 1980 to provide a grand alternative. Now, MBE is a network of more than 400 franchises specializing not only in postal service like mailbox rental, stamps, and package handling, but business services, office supplies and photo CT Page 16258 copying, also. MBE was featuered in IIME and Fortune magazines for its innovative concept and phenomenal success.
TORRINGTON ANNUAL RENTS
Tenant: Sq Ft Base Rent Annual Rent Automotive Tenants
AutoSpa Tune Up 1,840 $14.26 $26,238.00 AutoSpa Oil Lube 1,792 $14.26 $25,554.00 AutoSpa Car Wash 1,456 $14.26 $20,763.00 Ming of America 1,408 $13.50 $19,008.00 LifeGuard Brake 2,684 $17.00 $45,628.00 Novus Windshield Repair 2,039 $13.50 $27,526.50
$164,702.50
Convenience Tenants
Cape Cod Seafood 1,520 $13.50 $20,520.00 6-Twelve Convenient Mart 3,716 $20.00 $74,320.00 McKleans 2,262 $20.00 $45,240.00 Mail Boxes Etc USA 2,112 $13.50 $23,512.00
$168,592.00
Total Annual Rent $332,294.50
 ORDER TO SELL TORRINGTON ALL CARE CONVENIENCE CENTER
Size of Land: 2.13 acres (92,666 sq. ft.)
Size of Buildings: Building A: 5,978 sq. ft. Building B: 4,796 sq. ft. Building C: 10,055 sq. ft.
Total Building Size: 20,829 sq. ft.
Construction Specifications:
 Foundation: Continuous concrete spread footings with reinforced concrete foundation walls.
 Floor: Reinforced concrete slab placed over compacted structural fill.
Structural: Open web steel truss system with a galvanized steel deck.
Walls: Insulated concrete block, internally sealed with painted and weather-sealed exterior. CT Page 16259
Interior Partitions: Typically constructed of metal studs with fire rated gypsum board on both sides.
Tenants: 1. AutoSpa Oil Lube 2. AutoSpa Tune Up 3. AutoSpa Car Wash 4. Ming of America (detailing) 5. 6-Twelve Convenient Mart 6. McKleans (dry c1eaners) 7. LifeGuard Brakes 8. Cape Cod Seafood 9. Mail Boxes Etc USA (currently negotiating) 10. Novus Windshield Repair (currently negotiating)
Lease Terms: All leases are net, net, net. Leases are generally signed for 10 years with the option to renew for 2 terms off 5 years each.
 OPINION APPENDIX II APPENDIX II
A review of Plaintiff's Trial Exhibit 1 (the Brochure) and Defendant Farley's Exhibit A. (Known as Exhibit F-A). All references in this Appendix are to Exhibit 1. The pagination differs as between the two. The contents are the same.)
This Appendix sets forth:
 — the brochure page number (as written thereupon by Donald St. John during his testimony in the lower right hand corner of each page)
— the Title of the page;
 — A description of the testimony of Donald St. John about the Exhibit page;
 — occasional further description of the page by the court;
 — conclusory comments by the court about the page and the state of the evidence with regard to it.
CT Page 16260
RE: Page 1 of Exhibit 1
Title: "Industry Background Information"
Summary, Description or Actual Testimony About The Page:
 Q. What on that page influenced your decision that you made about Court `N Yards?
 A. . . . . It's telling me they're building something that's a little bit different and should be a winner.
 ". . . . [I]t's exact, specific information. I'm taken with the expertise this is done with and the care."
(Transcript, June 11, 1997, pages 78 79)
 The information to which plaintiff referred included subjects such as the decline in the number of neighborhood service stations and the increased length of time people keep their autos.
Court's Conclusion As To the Page and Testimony About It
 — not a representation touching the center of the case;
— not a representation about this property;
— not proven false
 — not proven known by uttering defendant broker(s) to be false;
— reliance thereupon rather vaguely expressed.
RE: Page 2 of Exhibit 1
Title: Summary of the Real Estate Investment Opportunity
Summary, Description or Actual Testimony About The Page:
 Here counsel asks no specific question and merely references the page.
CT Page 16261
 Plaintiff states: "It talks about . . ." (And plaintiff goes on to list topics the page touches-see below)
 "So it leads me to believe, again, they've done a lot of work and verified a lot of their information."
(Transcript, June 11, 1997, page 79)
 Amongst the myriad of topics is that developer/seller searches for and researches carefully new locations, choosing "prime retail properties", developer builds only when 60% of the potential space is leased; the parcels are between 15,000 and 25,000 square feet with adequate parking; researched for correct sizing for the various auto service businesses; tenants are to be franchisees of national franchisors; only 1.9% of auto establishments owned by franchisees in 1986 stopped operating.
Court's Conclusions As To the Page and Testimony About It
 — not a representation touching the center of the case;
 — not a representation specifically about the Torrington endeavor and some of the verbiage about what sellers do, which might suggest a bigger historical portrait than existed, is rather set straight by other information which reveals how few such projects seller has yet undertaken;
— not proven false;
 — not proven known by uttering defendant broker(s) to be false;
— reliance thereupon rather vaguely expressed
RE: Page 3 of Exhibit 1
Title: Discontinued Establishments Owned by Franchisees, Number and Percent, 1986. CT Page 16262
Summary, Description or Actual Testimony About The Page:
When counsel merely mentions the page, St. John states:
"Again, its very informative."
Counsel corrals him and asks:
 Q. What is it on this page . . . influenced your decision concerning the . . . property?
 A. It's continuous from page 2 they talked, specifically, about three of the operations in this cencer; the automotive products; the convenience stores; the dry cleaning. And again, they get down to minute information about the percentage of people that fail. And the three that are in this are or. the lower scale to fail. The source is given as Franchising and The Economy, U.S. Department of Commerce. It's good information. I would think it's good information.
(Transcript, June 11, 1997, pages 80-81)
 The page, referencing "Franchising n the Economy, 1986-1988 (U.S. Department of Commerce) lists, in two different columns, the "number of Discontinued Establishments" and "Per Cent of Total Establishments by Category". Twelve different general types of businesses are set forth. Included are auto products, convenience stores and dry cleaning, all of which were envisioned for space in this venture. The failure rates, respectively, were said to be 1.9 percent, 2.4 percent and 3.1. Only one type (Rental Services, Auto and Truck) was lower (at 1.7 per cent) and tour were higher than 3.1.
Court's Conclusions As To the Page and Testimony About It:
 — not a representation touching the center of the case;
— not a representation about this property;
— not proven false CT Page 16263
 — not proven known by uttering defendant broker(s) to be false;
— reliance thereupon rather vaguely expressed.
RE: Pages 4 and 5 of Exhibit 1
Title: Trends In Industries Related to Court `N Yards, USA
Summary, Description or Actual Testimony About The Page:
 Counsel essentially asks, about each page, which he recognizes as a 2-page item, "What is it on the page(s) that influenced his decision."
 A. "Okay. The U.S. Department of Commerce, again, is quoted. That indicates that all franchises in the automotive products and services, excluding car rentals, have increased the number of establishments from 35,100 to 41,500. Again, nothing is even rounded off; these are exact figures here that give me confidence. The dollar revenues have risen from 9.3 billion to 13.7 billion or 48 per cent in a period. T hate to be redundant, but everything that's in here leads you down that confidence."
(Transcript, June 11, 1997, pages 81-82)
As to page 5:
 "Again, the automotive products and services have a discontinuance rate of about 1.9 per cent, with only one exception. Franchisees in all of the groups had a discontinuance rate of 2.4 and 4.7. Again, the same confidence that it builds in me, that they've done a lot of source work, and there's a lot of source information here."
(Transcript:, June 11, 1997, pages 81-82
Court's Conclusion As To the Page and Testimony About It
 — not a representation touching the center of the case;
CT Page 16264
— not a representation about this property;
— not: proven false
 — not proven known by uttering defendant broker(s) to be false;
— reliance thereupon rather vaguely expressed.
RE: Page 6 of Exhibit 1
Title: "Comparative Growth in Number of Establishments and Sales, 1984-88
Summary, Description or Actual Testimony About The Page:
 Asked the same question, that is, what influenced him on said page abut the property, St. John responds:
 "U.S. Commerce is the source. And again, it is very precise and it's information that I would deem very reliable
(Transcript, June 11, 1997, page 82)
 It is noted that plaintiff gives the testimonial record no specifics at all beyond his belief that it conveys information he would deem "very reliable".
 The chart-type page shows increases in both sales and number of establishments in each of the 5 years portrayed for franchise establishments in automotive products and services and convenience stores and decreases for gasoline service stations.
Court's Conclusion As To the Page and Testimony About It
 — not a representation touching the center of the case;
— not a representation about this property;
— not proven false
 — not proven known by uttering defendant broker(s) to be false;
CT Page 16265
— reliance thereupon rather vaguely expressed.
RE: Paqe 7 of Exhibit 1
Title: None. (First sentence begins: "Court `N Yards also builds a larger . . . [Center] that has other "light retailing' in addition to car services."
 It is clear that pages 7, 8 and 9 are a 3-page continuum. Ultimately, however, counsel asks plaintiff about each of them and thus 8 9 will receive separate treatment herein.
Summary, Description or Actual Testimony About The Page:
 Counsel again inquires as to what on this page influenced plaintiff's decision about the property:
 "It says that Court `N Yards builds larger, all-care centers . . . In addition to the car services, they have other traffic draws such as convenience marts, dry cleaning, the convenience snore, which is what this center in question was to have. They underline, the traffic is necessary to provide — they feed off each other. That's kind of an obvious thing, but it's nice that it was in there. It goes on to talk about they currently have one property available for sale, and it's near completion in Connecticut. One is under construction in Florida; two are option properties in North Carolina, South Carolina. It gives me the confidence that this is not a one-shot deal for them. They are doing it all the time and obviously it's successful if they have that many going at one time."
(Transcript, June 11, 1997, page 83)
 Here, it appears plaintiff has recalled these statements as larger in substance than they were at the time. In fact, none of the other projects he refers to are further along than the one plaintiff bought. (The Connecticut reference is the Torrington endeavor)
 The page also notes that the developer's plan was to sell prior to construction "under a. contract which protects the prospective investor," and that 60% of CT Page 16266 the space is intended to be leased before the start of construction.
 The page further states that the "light retailing" will provide more traffic draws via convenience marts, mail services, dry cleaning and shoe repair and that car washes "normally attract 300 to 800 customers per day" and that a "6-12" store "attracts 800 to 1200 customers per day."
Court's Conclusion As To the Page and Testimony About It:
— not proven false
 — not proven known by uttering defendant broker(s) to be false;
— reliance thereupon rather vaguely expressed.
RE: Page 8 of Exhibit 1
Title: None. (A continuation of page 7) First sentence begins, "The sale to the investor. . . ."
Summary, Description or Actual Testimony About The Page:
 Counsel again inquires as to what on this page influenced plaintiff's decision about the property:
 "Well, they give me a very exact return on my investment; they spell it out for me; they spell it out for me in great detail. Again, we're looking down . . . the tube to years three, four, five through ten. They give me exact figures; 10.3 per cent; 10.6 per cent; 10.9 per cent; nothing is rounded off. Everything seems to be well thought out and absolutely good information. And the big thing at the bottom of this page, Court `N Yards wants to remain the manager of each car court. The investor is free to choose, which I didn't want to do. They're offering that which I wanted, and they have a continued, ongoing thing by doing, being the manager."
(Transcript, June 11, 1997, page 84)
 The "exact return" plaintiff referred to in his CT Page 16267 testimony us obviously a reference tot he sentence on page 8 which states that "The sale price will be set such that the net, net lease revenues will provide a return to the Investor of ten (10%) in the first two years." It will be recalled that plaintiff told Linda Landan he wanted a 10 per cent return without having to manage the property chosen.
 The bulk of the remainder of page 8 (paragraph 5) is a dual set of projections for annual percentage returns in years 3 through 10. The different sets of per cent of returns utilize different annual rent increases (3 or 5 per cent) which depend upon either inflation or cost of living clauses in the leases.
 Another paragraph (6) notes that the Investor is free to utilize its own management entity, but that this seller would like to remain manager as it is in seller's long-term interest to see that the centers are successful. The paragraph also notes that. management will not be a "primary profit, center" for seller.
Court's Conclusion As To the Page and Testimony About It:
— not proven false
 — not proven known by uttering defendant broker(s) to be false;
— reliance thereupon rather vaguely expressed.
RE: Page 9 of Exhibit 1
Title: None. As noted, 7, 8 and 9 are a continuum. First words at top of page 9 are ". . . responsibility of maintaining the quality. . . ."
Summary, Description or Actual Testimony About The Page:
 Counsel asked his usual, "What information on that page influenced your decision about the . . . property . . .
 "That very first line was very important to me. They're going to come on and not only build it, they will offer to manage it and assure that it's successful
CT Page 16268
(Transcript, June 11, 1997, page 85)
 After a paragraph referencing promotional programs, upon which plaintiff did not remark, the following paragraph appears:
 "In addition to the long term value of the basic building and the land, an investor in the properties acquires certain leasehold improvements paid for by the tenants. These tenant expenditures include utilities to support operating equipment and modifications to the offices and bathrooms (not simply decoration.) The value of these investments may be $350,000 to $400,000."
 With apparent regard to that paragraph, Mr. St. John added to his original (and only) answer about page 9: "The leasehold improvements are built in there. In some cases, that's of some value; in other cases, it wasn't. But that was there in some cases."
(Transcript, June 11, 1997, page 85).
Court's Conclusion As To the Pages (7, 8 9) and Testimony About Them:
 — Unlike the predecessor pages, these pages do discuss this seller. The projections rather obviously refer to the program for all of the seller's intended automalls. Ultimately, however, plaintiff, through counsel, was to become privy to "actual" (such as they were) leases prior to closing, by which time guarantee(s) were also in place. The opinion attached hereto discusses reliance diverted or displaced and the necessary diminution reliance undergoes when investigation occurs.
 — The numbers themselves are merely descriptions of what the leases are going to have as terms.
 — It seems fair to say that these pages are not proven false. That is, plaintiff has not proven that the leases, acceptable (with guarantee) as closing was to occur, differed materially from the description in these pages.
CT Page 16269
 — Further, as with the contents of earlier pages, plaintiff has not proven defendant broker(s) knowingly uttered falsehoods in giving plaintiff these pages.
RE: Pages 10 and 11 of Exhibit 1
Title: "Consolidated Balance Seet (Sic) McKelans (Sic) Incorporated As of July 31, 1987"
 [This is a 2-page entry with the first pace treating liability and equity, and the second covering assets.]
Summary, Description or Actual Testimony About The Pages:
 Plaintiff once again is asked what on this sheet influenced his decision about the property:
 Plaintiff answers: "It appears that McKleans, as a tenant, had what I thought was a healthy balance sheet." Plaintiff agrees his answer would be "pretty much the same" when his attention is drawn to page 11, a continuation of page 10.
(Transcript, June 11, 1997, page 86)
Court's Conclusion As To the Pages and Testimony About Them:
 — The documents do concern this specific development and a specific tenant slated to reside within it.
 — The pages were not proven false nor known to be false by defendants when uttered. (McKleans did not move in; another dry cleaner came to be the subject of a lease guarantee (Torrington Cleaners) It did not move in either. (See Appendix III).
Re: PageS 12 13 of Exhibit 1
Title: "AutoSpa Corporation and Subsidiaries, Liabilities and Stockholders Equity"
 This section is in 2 pages. The major heading on each page is the same. The subheading on 13 is "Consolidated Condensed Balance Sheet (unaudited)."
CT Page 16270
Summary, Description or Actual Testimony About The Pages:
 These unaudited statements/balance sheets speak to a date of March 31, 1988.
 This pair of pages received attention almost too scant to include here. It is best to set out the entire reference in order to demonstrate.
 Q. On page 12, which is AUTOSPA . . . and subsidiaries, what is that?
A. It's the liability, stockholder's equity.
 Q. So it's more financial information that you looked at?
A. Yes. And the bottom line looked healthy.
 [Counsel then went on to the next brochure entry] (Transcript, June 11, 1997, pages 86 87)
Court's Conclusion As To the Pages and Testimony About Them:
 — The documents do concern this specific development and a specific tenant slated to reside within it.
 — Reliance thereupon is not clearly or specifically claimed.
 — The statements were not proven false nor proven known to be false when uttered by defendants.
Re: Page 14 of Exhibit 1
Title: Torrington Tenant List
 This is a single page section. (The lower third is separately treated in the main text of this opinion dealing with prevailing rental rates in other local places)
 The upper portion of the page is a list of 6 "automotive" tenants and 4 "convenience" tenants. Four columns to the right of each name set out the square CT Page 16271 footage, base rent, initial term and option period. (Two of the tenants are parenthetically noted to be `Negotiating'."
Summary, Description or Actual Testimony About The Pages:
 Counsel again asked what on this page influenced St. John's decision about the property.
 "The various tenants; their exact square footage; Their base rent; the term of the lease was very precise, and. I presumed it had been researched . . . They're separated from the convenience store and McKleans and Mail Box, and more importantly. . . ." (Then plaintiff goes on to refer to the footnote which has its own major section in the main text)
(Transcript, June 11, 1997, page 87)
Court's Conclusion As To the Page and Testimony About It:
 — Of course, the page is specific to this project and the tenants said to be slated. This area was investigated by Attorney Farrell whose review prior to closing was somewhat lease intensive. Doubts as to who was there were resolved by the time of closinq.
 — No specific falsehood as to lease specifics was proven.
Re: Pages 15-18, of Exhibit 1
Title: "Torrington Tenant Financial Information" (pages 15, 16 17) and "Torrington Tenant Descriptions" (page 18)
Summary, Description or Actual Testimony About The Pages:
 Pages 15, 16 and 17 have seven narrative sections about the entities . . . 6-Twelve Convenience Mart (Twice) McKlean's Dry Cleaning System (Twice), Novus Windshield Repair, and AutoSpa Corporation (Twice)
 Page 18 has a different title: "Torrington Tenant Descriptions." It has three narrative sections, entitled Torrington Lifeguard Brake and Muffler, Inc., CT Page 16272 Cape Cod Seafood, and Mail Boxes, Etc. (USA)
 Had no separate title been set out for page 18, different from that which covers pages 15, 16 and 17, no one would know the difference. It is true that the last 3 sections, i.e., on page 18, are under a heading which does not promise financial information and none is actually given. However, 3 of the first seven sections, on pages 15-17, are also without financial information.
 These pages of the brochure were discussed for several pages of trial testimony while plaintiff was on direct examination.
(Transcript, June 11, 1997, pages 94-105)
 It is difficult to characterize plaintiff's testimony as to these pages. In many instances he stated he felt that the person owning or running the business referred to had to have been interviewed for the brochure by the author(s) of the document (whom he believed were the brokers) At other points plaintiff said he was impressed that certain franchisees were involved, having invested their own money in their own business; he voiced his own belief (his "experience, " he termed it) that franchises "hold up better." (Id. at 97). Plaintiff was especially taken with the apparent rosy future of the dry cleaning business, owing in significant measure, the pages note, to the increase of women in the workplace.
Court's Conclusions As To the Pages and Testimony About Them:
 — The reliance expressed by plaintiff was rather general or non-specific. Little, if anything, was proven untrue. Of course, many of these tenancies did not come to pass. These facts were known at closing, however.
Re: Page 19 of Exhibit 1
Title: Torrington Annual Rents
Summary, Description or Actual Testimony About The Pages:
CT Page 16273
 This page is essentially one which could have been blended in with page 14. which was entitled "Torrington Tenant List". The same 10 tenants are listed with the same square footage and "base rent" numbers set forth. What this page adds is the annual rent of each tenant with an overall total of $333,294.50. What page 14 has that this one does not is the initial term and option period for the leases of the intended tenants.
 Plaintiff's counsel asked plaintiff his usual "What on this page influenced your decision to purchase the property?" Plaintiff stated: "The first thins was that the annual rents would give me the 10 per cent return that I wanted. The rest. . . . all the tenant's square footage was precise; the base rents are precise; the annual rents are precise; everything on here is precise. There is solid source information here, and that makes it very believable and I relied on this information."
(Transcript, June 11 1997 pages 105-06).
Court's Conclusion As To the Page and Testimony About It:
— The court's comments about page 14 pertain here.
Re: Page 20 of Exhibit 1
Title: "Offer to Sell Torrington ALL CARE Convenience Center"
Summary, Description or Actual Testimony About The Pages:
 By all rights this page was designed to be the introductory one but, inexplicably, wound up at the end of the exhibit plaintiff used at trial. Its twin, Exhibit F-A, does have this page up front.
 This page does not seem to be the focus of claims of misrepresentation, for it is fairly thoroughly occupied with physical aspects. The page relates acreage, building sizes (there are three buildings), construction specifications as to foundation, floor, structural, walls and interior partitions. It lists tenants (10), which appear elsewhere, the price sought ($3,332,945) and says this about "Lease Terms:" "All leases are net, net, net. Leases are generally signed CT Page 16274 for 10 years with the option to renew for 2 terms of 5 years each."
 Plaintiff's counsel asked: "What information on that page . . . influenced your decision whether or not to purchase the property?" Plaintiff responds: "This page is a very factual page." [Plaintiff states some of its facts]. "This information is precise, exact information. Again, it instills confidence; I don't have to go and look for all this stuff. Then it goes on to list the tenants; they are all good tenants."
(Transcript, June 11, 1997, pages 110-11)
Court's Conclusion As To the Page and Testimony About It:
 — This page contains little material not already noted and commented upon as it appeared on other pages. Nothing on this page which is unique to this page was proven untrue; that which is uniquely page 20 material concerns itself with physical construction detail.
 OPINION APPENDIX III Appendix III: "Snap Shot of Closing Date"
A. Tenants Listed in Brochure:
 Autospa Ming Lifeguard Novus CapeCod 6-12 McKleans/ Mailboxes
 Torr. Clean.
Date Moved In Was in Was nearly Was in Was in
 at closing Never in or Never at closing at closing Never Never — Farrell
 (3 entities) in at closing knew they
 were not
 going to move in
 at closing.
Rent Paid 3/89 None None None 2/89-8/89 None None None
B. Other Tenants:
 Equity Franchise Avis Lube Car Phone Enterprise Baraco Detail Store SM Landscaping
 Assistance, Ltd.
Rent Paid None 1990-97 1991-97 1991-96 1994-97 1996 1996
C. Leases Guaranteed:
CT Page 16275
 Autospa Lifeguard Cape Cod 6-12 Torr. Clean. Equity Franchise
 (Gary Assistance, Ltd.
 Franklin)